## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **RICHARD IRVING BECKMAN AND** | ) | |
| **KARI ANN BECKMAN** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **V.** | ) | **Civil Action No. 2:23-CV-00034** |
| | ) | |
| **REGINA CAELI, INC. a/k/a REGINA** | ) | *Electronically Filed* |
| **CAELI ACADEMY AND FATHER** | ) | |
| **AUGUSTINE TRAN** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

In accordance with Federal Rule of Civil Procedure 15(a)(1)(B), Richard Irving Beckman ("Rich") and Kari Ann Beckman ("Kari") (collectively, the "Beckmans" and "Plaintiffs") file this First-Amended Complaint against Regina Caeli, Inc., a/k/a Regina Caeli Academy ("RCA"); Father Augustine Tran ("Fr. Tran"), individually, as director and/or officer of RCA, and as a priest of the Roman Catholic Archdiocese of Atlanta; and the Roman Catholic Archdiocese of Atlanta (the "Archdiocese of Atlanta"), and state as follows:

### JURISDICTION AND VENUE

1.       Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction because the dispute arises under the Constitution, laws, or treaties of the United States, including, but not limited to, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

2.       Pursuant to 28 U.S.C. §1332(a), this Court has subject matter jurisdiction because the dispute is between citizens or entities of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

3.       This is, in part, an action at law and in equity for copyright infringement arising under the laws of the United States of America, codified at 17 U.S.C. §§ 101 et seq.

4.      This Court has exclusive federal jurisdiction over the subject matter of Plaintiffs' claims under 28 U.S.C. § 1338.

5.      This Court has general personal jurisdiction over RCA because RCA maintains substantial, continuous, and systematic contacts with the State of Texas. RCA maintains five (5) campuses in the State of Texas—more than any other state—and the majority of RCA's Board of Directors reside in Texas. Alternatively, the Court has specific personal jurisdiction over RCA because RCA has minimum contacts with the State of Texas from which Plaintiffs' causes of action arise, RCA has purposefully directed its activities or availed itself to the benefits of the State of Texas, and the Court's exercise of personal jurisdiction over RCA is fair and reasonable.

6.      This Court has general personal jurisdiction over Fr. Tran—in his individual capacity, as well as his capacities as director and/or officer of RCA and as priest of the Archdiocese of Atlanta—because he maintains substantial, continuous, and systematic contacts with the State of Texas. Despite his residing in the State of Georgia, Fr. Tran, in addition to being RCA's Chaplain and a member of its Board of Directors, also maintains its information technology. In doing so, he assists in RCA's internet efforts at recruiting students to RCA's Texas campuses. Additionally, Fr. Tran frequently travels to the State of Texas to visit RCA's campuses for speaking engagements, meetings, graduations, conferences, and to provide spiritual guidance to RCA's staff and students. Furthermore, Fr. Tran frequently travels to the Pious House in Tyler, Texas, and based on knowledge and belief, intends to relocate to Tyler, Texas, to lead the Pious House's Oratorian. Alternatively, this Court has specific personal jurisdiction over Fr. Tran because he has minimum contacts with the State of Texas from which Plaintiffs' causes of action arise, he purposefully directed his activities or availed himself to the benefits of the State of Texas, and the Court's exercise of personal jurisdiction over him is fair and reasonable. Fr. Tran provided spiritual guidance to the Beckmans in the form of telephonic counseling sessions while they

2

resided in Winona, Texas, and later personally travelled to Winona, Texas to administer to Kari the Sacrament of Reconciliation for Kari under the Seal of Confession.

7.      For purposes of personal jurisdiction, the actions of an agent are attributable to the principal. At all relevant times, Fr. Tran, as a priest of the Archdiocese of Atlanta, acted as agent of the Archdiocese of Atlanta, possessing either actual or apparent authority to act on behalf of the Archdiocese of Atlanta or having his tortious conduct subsequently ratified by the Archdiocese of Atlanta. Plaintiffs impute all facts pleaded herein related to this Court's personal jurisdiction over Fr. Tran to the Archdiocese of Atlanta.

8.      Venue is proper in this district because a substantial part of the events or omissions giving rise to this action occurred in this district.  28 U.S.C. § 1391. Port O'Connor, Texas—the city in which the Beckmans reside—is situated within the Southern District of Texas. RCA issued a 2021 Form 1099-MISC and amended 2021 Form W-2, erroneously alleging that the Beckmans received additional compensation income and engaged in an excess benefit transaction during 2021.  RCA issued the 2021 Form 1099-MISC and amended 2021 Form W-2 to the Beckmans and notified them via e-mail at their home in Port O'Connor, Texas.  The 2021 Form 1099-MISC and amended 2021 Form W-2 constitute a substantial part of the events giving rise to this lawsuit. *See Bounty-Full Entm't v. Forever Blue Entm't Grp.*, 923 F. Supp. 950, 958 (S.D. Tex. 1996) (noting that "the sending of the letter constitutes sufficient "minimum contacts" for purposes of specific personal jurisdiction" and finding venue proper under 28 U.S.C. § 1391(a)(2) because "the letter in question constitutes a substantial part of the events giving rise to this lawsuit.")

## PARTIES

9.      Plaintiff Richard Beckman is a domiciliary of Port O'Connor, Texas.

10.     Plaintiff Kari Beckman is a domiciliary of Port O'Connor, Texas.

11.     Defendant RCA is a Georgia non-profit corporation with its principal place of

business located at 1565 Holcomb Bridge Road, Roswell, Georgia 30076.  RCA's registered agent

for service of process is National Registered Agents, Inc., 289 South Culver Street, Lawrenceville,

Georgia 33046.

12.    Defendant Fr. Tran is a domiciliary of the State of Georgia and may be served at

3393 Forestwood Drive, Suwanee, Georgia 30024, or wherever he may actually be found.

13.    Defendant Archdiocese of Atlanta is a domestic non-profit corporation formed in

the State of Georgia and may be served with process by serving its registered agent as follows:

> Stephen M. Forte
> 1105 W Peachtree Street NE
> Suite 1000
> Atlanta, GA 30309

## FACTUAL BACKGROUND

14.    The Beckmans file this action in response to a pattern of abuse, harassment, and

inappropriate actions RCA has lodged against the Beckmans, which date back to at least October

2021 when RCA wrongfully terminated the Beckmans' employment after almost nineteen years

of service.

15.    RCA continues to engage in inappropriate actions against the Beckmans, including,

but not limited to RCA erroneously issuing an amended 2021 Form W-2 to Kari and a 2021 Form

1099-MISC to Rich in or around December 2022.  In doing so, RCA again has falsely and publicly

harassed the Beckmans because RCA is a non-profit corporation and its tax allegations are public

record.

16.    The Beckmans founded RCA around April 29, 2003.  Among other reasons, the

Beckmans founded RCA because they were dissatisfied with the cost and curriculum offered by

many of the Catholic schools available to their children in the Atlanta, Georgia area.

## A.    Founding Regina Caeli Academy

17.    The Beckmans founded RCA to provide a classical Catholic education option for

4

families and their children with in-class instruction two days a week and homeschooling based on the curriculum for the remainder of the school week.  The curriculum focuses on academic excellence in addition to virtuous living principles based on the Catholic tradition.  RCA enrolls students from Pre-Kindergarten through twelfth grade.

18.     Among the foundational principles that RCA incorporated into its curriculum are the virtues of repentance and forgiveness—the most basic tenets of the Catholic Church and teachings of Jesus Christ.

19.     Prior to RCA's formation, Kari authored the shield logo and emblem ("Logo") and RCA's Mission Statement ("Mission Statement") (collectively, the "Intellectual Property").  In her capacity as the author and owner of the Logo and Mission Statement and derivatives thereof, Kari has filed, and subsequently received, copyright registrations for the Logo and the Mission Statement.  The copyright registration numbers for the Logo and Mission Statement are VA 2-301-284 and TX 9-054-637, respectively.   All Intellectual Property was created prior to the formation of RCA on April 29, 2003.  Kari is the sole owner of all right, title, and interest in and to the copyrights in the Intellectual Property.

20.     Initially, RCA established one center in Atlanta, Georgia, which the Beckmans used their family's own funds to start the program.  After opening the first center, Kari led RCA through its early days to meet the requests of interested families and to implement the RCA program in other geographical regions.  Serving as Executive Director, Kari was unpaid for the first five years of RCA's existence.

21.     Additionally, since inception, Rich Beckman served as RCA's President and Chairman of the Board until around November 2021.  During Rich's service as an officer and director of RCA, he never received a salary or other remuneration for the time expended in these capacities.

22.     RCA grew into a thriving non-profit and educational institute with twenty-three centers in the United States and two affiliated centers in the United Kingdom, serving thousands of students and their families during the nineteen years the Beckmans led the organization, including Kari's work as Executive Director of RCA.

23.     The Beckmans' leadership and self-sacrifice was acknowledged countless times, with Kari receiving exemplary annual reviews and guiding RCA through annual financial audits beginning in 2014 with no improprieties or irregularities ever reported.

24.     During Kari's tenure as Executive Director, RCA and its Board of Directors benefitted from the Beckmans' sacrifice, leadership, and financial prudence, which led to RCA's enduring financial health and opportunities for expansion over RCA's first eighteen years in existence.  Only after the Beckmans were terminated did RCA fail to open new centers.  In fact, as of 2023, RCA contracted to only nineteen locations within the United States.

25.     As RCA's founding stakeholders and beneficiaries of services provided, the Beckmans have grave concerns about the stability and viability of the organization.  These concerns are derived from factual evidence, including the closing of locations, declining student enrollment, altering student formation practices, and excessive staff turnover.  These actions are the result of mismanagement and egregious negligence by fiduciary decisions made in violation of civil law and departing from the founding principles of RCA.

26.     In addition to founding and managing RCA over the course of nearly nineteen years, the Beckmans also enrolled their eight children in RCA from 2003 to 2022, with six of their eight children graduating from RCA.

**B.     Veritatis Splendor**

27.     In January 2021, the RCA Board of Directors approved the purchase of 575 acres in Winona, Texas for a new project called Veritatis Splendor ("<u>VS</u>").  RCA envisioned this project

to be a uniquely integrated Catholic community where people could more fully live out their faith. The VS community would provide members with a complete array of benefits, including daily, integrated Sacramental life; indoor and outdoor recreation activities; food cooperative services supported by a large greenhouse and organic farming; and education services spanning kindergarten through high school, university, and graduate school studies.

28.     The VS property purchase included an existing residential lodge, but otherwise required extensive development and maintenance to convert the property into the RCA-envisioned community.  The Beckmans offered to uproot from the Atlanta, Georgia area after twenty-five years of residence and move to Winona, Texas to fulfill the promise of this vision.

29.     In early 2021, following the purchase of the VS property, the RCA Board of Directors approved the Beckmans relocating their family to Winona, Texas in order to lead the overall project development.  The Board of Directors approved the Beckmans staying in the existing residential lodge on the VS property without paying rent in lieu of hiring a caretaker, which the Board of Directors acknowledged would be significantly more expensive.

30.     Additionally, the Board of Directors approved the purchase and use of a four-wheel drive vehicle for the Beckmans to traverse, develop, and market the VS property, which is all-natural Texas terrain with varying elevations and conditions.  This was the only time in Kari's tenure that a vehicle was required to perform her duties, and thus, RCA provided.  The Beckmans primarily used the vehicle for business-related activities.

31.     While the Beckmans resided on the VS property, they insisted on paying for all utilities for the entire property while in residence, rather than burdening RCA with the costs.

32.     As caretakers of the VS property, the Beckmans expended extensive time and effort to prepare the VS property for sale.  Specifically, Kari engaged in the following:  marketing; working with local realtors; sales event planning; property showings, including evenings and

weekends; networking support of the project; and media appearance and coverage of the projects on both the local and national level for which Kari received no additional remuneration.

33.     Rich Beckman volunteered his time to develop the property, including, but not limited to, engaging with civil engineering professionals to plat residential lots, which included many meetings and hours to complete; creating a master development plan with project phases; finding and engaging excavator companies to install roadways, including multiple meetings to finalize plans; engaging the electric and water suppliers to ensure plans for 75 home sites; securing the support of the county commissioner and Winona mayor; and supporting open house weekends for prospective buyers.

34.     The effort and hours that the Beckmans expended for the VS community more than offset the Board-approved rental and auto expense incurred.

35.     While residing at the lodge and assisting to develop the VS community, the Beckmans also continued their duties with RCA.  As such, the lodge served as Kari's primary RCA office in addition to the headquarters for the VS project.

36.     In addition to serving as the caretakers of the VS property, the Beckmans planned to purchase a lot in the VS community to build their home and then convert the existing lodge into a general use facility.

37.     In a show of gratitude and recognition for the many volunteer hours, the Beckmans worked on the VS project in 2021, and in an effort to allow the Beckmans the continued ability to expand the efforts of VS in furtherance of RCA's mission, RCA offered the Beckmans a fifty percent discount on a lot in the VS community, which reduced the purchase price from $75,000 to $37,500.

## C.     Mental Health Crisis and Dismissal

38.     In the spring and early summer of 2021, Kari began experiencing significant mental

health and spiritual issues resulting from a personal lapse in judgment.  Specifically, several months prior, a then-RCA director ("former Director") and Kari engaged in an inappropriate relationship.

39.     Although the inappropriate relationship had been terminated, Kari's mental health continued to deteriorate.  The perfect storm of the enormity of RCA responsibilities, the totality of working many long hours, the nature of her standing in the Catholic community, the complexity of the position and status of who she had the inappropriate relationship with, and the weight of her own disappointment and guilt culminated in a nervous breakdown and suicidal state of mind on October 13, 2021.

40.     That same evening, Kari placed herself on a medical leave of absence and began to seek treatment for her mental health condition.  Kari initially was treated at the University of Texas hospital behavioral health emergency center in Tyler, Texas and began therapy with a licensed counseling professional, which she continues to date.

41.     On October 14, 2021, Kari confessed her inappropriate relationship to Rich, who, with supernatural grace, quickly forgave her and committed to a path of restoration and healing.

42.     Additionally, Kari sought spiritual guidance from Fr. Tran, in his capacity as Chaplain for RCA and priest of the Archdiocese of Atlanta.  Initially, Kari contacted Fr. Tran by telephone for spiritual counseling, and then he travelled to Winona, Texas to further counsel the Beckmans and administer the Sacrament of Reconciliation for Kari under the Seal of Confession. The Beckmans remain committed to each other in the Lord, and recently celebrated 30 years of marriage.  The Beckmans planned to focus on restoring their marriage and Kari's mental health during Kari's leave of absence and then resume their duties with RCA at an appropriate time.

43.     Shortly after Kari began her leave of absence, the RCA religious liberty attorneys contacted Rich in his capacity as President and Chairman of the Board of RCA and informed him

that they were aware of the inappropriate relationship, which was likely to become public. Presumably, RCA's religious liberty attorneys became aware of the then-Director's initiation of the inappropriate relationship with Kari.  The RCA religious liberty attorneys also represented other interests affiliated with the RCA director with whom Kari shared an inappropriate relationship.

44.     Rich sought guidance from Fr. Tran, who was already aware of the inappropriate relationship, having provided spiritual direction to Kari on the issue.  Fr. Tran was supportive and encouraged Rich, stating, "this is not the end of the world."  Accordingly, at the direction of the RCA religious liberty attorneys, Rich informed the RCA Board of Directors of the inappropriate relationship, after which they accepted Kari's request for a leave of absence.  During that time, the Board of Directors comprised Fr. Tran, James Faber, Dan Saegaert, and Frank Scarchilli.

45.     After informing the Board of Directors, Rich also informed the other RCA officers, including Katrina Hartsock, the Director of Education; Nicole Juba, the acting Executive Director; and Annalisa Agustin, the Director of Development (the "RCA Officers") of Kari's inappropriate relationship, mental health issues, and her approved medical leave of absence.  The RCA Officers all reported directly to Kari, as Executive Director.  Rich later had an in-person meeting with Nicole Juba to discuss Kari's situation and discuss Kari's performance during the past year, which included the opening of seven new RCA centers in the fall of 2021—an RCA all-time record.  Rich and Nicole Juba also discussed whether Kari would be able to return as Executive Director, which Nicole Juba then shared that Nicole was not yet ready to be Executive Director.

46.     During the last two weeks of October 2021, the RCA Board of Directors met to discuss the proposed length of Kari's leave of absence and whether such leave of absence would be paid or unpaid.  Rich recused himself during the portion of the meeting discussing whether Kari's leave of absence would be paid or unpaid, but noted that the Board of Directors was

supportive and did not discuss termination during the meeting.

47.     However, shortly after this Board of Directors meeting, Rich received a text message from an RCA board member alerting Rich to a Board of Directors meeting called without his notice in violation of RCA's Articles of Incorporation meeting notice requirements, stating that Fr. Tran called a Board of Directors meeting to address an email Fr. Tran received from the RCA Officers insisting that Kari be terminated.  This first attack alerted the Beckmans that the RCA Officers were conspiring to oust Rich and Kari under threat that the RCA Officers would all quit if Kari was not fired.  This was a shocking and devastating betrayal of the RCA Officers' proclaimed "love" for RCA's foundress, who the RCA Officers now identified, in their judgment, as a horrific sinner undeserving of mercy.  Thus began the hostile takeover of RCA.

48.     The RCA Officers launched a campaign against Kari using current and former employees and associates to justify their defamatory actions during Kari's worst spiritual, mental, and physical condition of her life.  The RCA Officers seized this opportunity to control RCA for their own gain, using egregious behaviors while Kari was on medical leave of absence.

49.     While on medical leave of absence and suicide watch, the RCA Board of Directors demanded that Kari attend a meeting on October 31, 2021, where they insisted that Kari either resign or be fired.

50.     Upon asking for their reasoning, The Board of Directors alleged that Kari violated the RCA Code of Conduct.  The Beckmans adamantly disagreed with this reasoning and voiced their concerns because RCA had never dismissed an employee for a past personal sin that had been confessed and reconciled.  Based on RCA's flawed reasoning, the Code of Conduct could be used against any employee's past forgiven and repented sins, violating Catholic principles and teachings.  In fact, on numerous occasions, former employees had been invited back to employment after curing personal sins that were confessed and reconciled, placing them in good

standing with the Catholic Church.  Furthermore, as RCA's first and original employee, Kari had not consented to nor ratified the RCA Code of Conduct in writing.

51.     Adding insult to injury, during this October 31, 2021 meeting Fr. Tran inappropriately revealed details of the confidential conversation Kari and Fr. Tran had following her nervous breakdown and during her mental health crisis in an apparent effort to influence the Board of Directors, stating: "I know I told you during our phone call that you had not ruined everything, but now I think you have."  In the same meeting, Fr. Tran accused Kari of not being repentant after hearing her confession approximately one week prior.  Fr. Tran reiterated his accusations in an email he sent to Kari on November 2, 2021. At or around this time, Fr. Tran publicly referred to Kari as a narcissist, despite having no training or experience as a mental health professional, and encouraged others to disassociate themselves from Kari—including two of Kari and Rich's own children.

52.     Fr. Tran is Godfather to one of the Beckmans' children, confirmation sponsor to another, provided spiritual direction to the Beckman family, and traveled extensively with the family for nearly twenty years.  During 2021 and 2022, Fr. Tran, while still RCA Chaplain, also assumed the role of Chief Financial Officer of RCA.  Collectively, these material facts clearly demonstrate a conflict of interest that should have led Fr. Tran to recuse himself from any decisions affecting Rich, Kari, or the Beckmans' children.

53.     Fr. Tran further violated professional confidentiality as a counselor to the Beckmans by revealing information to the Board of Directors, which the Beckmans shared with him in his capacity as a priest and Chaplain of RCA.

54.     The October 31, 2021 meeting ended abruptly with the RCA Board of Directors providing an ultimatum for Kari to resign, or be fired.  The Board of Directors, excluding Rich,

purposefully called a meeting, without noticing the President and Chairman of the Board (Rich) to placate at best, and conspire, at worst, with the RCA Officers to plan to terminate Kari.

55.     In parallel, Kari's therapist has opined that Kari had no business working, making important decisions, or being forced to attend a Board of Directors meeting (the subject of which was her dismissal), since Kari was on leave of absence and had been diagnosed with Complex Post-Traumatic Stress Disorder and Complex Grief.

56.     Subsequently, Rich, in his capacity as President and Chairman of the Board, after having corresponded with RCA's corporate counsel who represented RCA for several years and understood RCA's mission and vision, called a properly noticed Board of Directors meeting to discuss another option, wherein Rich proposed a more gradual transition of duties rather than the Board of Directors' proposal of summary dismissal.  This was based on Rich's 25-year consulting career and experience with companies facing changes and the risk to operational stability to make sudden and ill-planned leadership changes.

57.     Kari's therapy diagnoses and the relevant factual circumstances supporting Rich's proposal to take a slower approach are as follows:  (1) the inappropriate relationship had ended and the former Director was no longer with RCA, (2) the aftermath of such caused extreme emotional duress given the former Director's involvement and influence with RCA, (3) RCA was not compromised by the relationship nor was Kari's performance as Executive Director, (4) Kari confessed her sin and sought absolution, (5) historically, RCA had never dismissed an employee for a Code of Conduct violation in which subsequent correction and atonement did not result in an opportunity to return to RCA, and (6) Kari was not caught in her sin—in fact, she voluntarily disclosed the issue and requested a leave of absence to address the spiritual, mental, and physical ramifications.

58.     Notwithstanding Rich's well-reasoned arguments and Kari's health conditions, the Board of Directors, conspiring with the RCA Officers who had called for Kari's termination, summarily refused to consider alternatives and instead decided that Kari must resign, retire, or be terminated, giving Kari 48 hours to decide—again, while Kari was on an approved medical leave of absence and in no state of mind to make such life-altering decisions.

59.     Faced with this extreme pressure from the Board of Directors, Kari decided that rather than be "fired" from RCA—a non-profit organization that she and Rich founded and dedicated nineteen years of their lives to nurture and build—Kari offered to retire at the end of the upcoming school year (i.e., around May 2022) to allow for a smooth transition period and for succession planning to new leadership.  Such succession planning had never been contemplated until the hostile takeover forced Kari out in November of 2021, although the Board of Directors and the acting Executive Director, Nicole Juba, intentionally represented otherwise to the entire RCA organization and its enrolled families via email, which also falsely implied that Kari had not been actively running RCA for the past year.

60.     At this point and for some time into the future, Kari lacked the mental clarity to make an informed decision, but nevertheless, RCA once again made a rash deviation from an agreed upon plan for a smooth transition and a timeline based on a May 2022 retirement.  Fr. Tran enlisted the assistance of Lisa Wheeler of Carmel Communications, who RCA contracted as their communications liaison, to document a letter while Lisa tended to Kari in her bed-ridden and incapacitated state, and within an imposed two-hour time limit, stating Kari's retirement would be immediate.  Such letter was disseminated to all RCA employees and families.

**D.     Additional Actions of Conspiracy**

61.     In the midst of the Board of Director's ousting of the Beckmans, led by Fr. Tran and the RCA Officers, the Board of Directors received an email from a source titled the "Unduer

of Knots", which set forth in detail the events reported only to the Board of Directors and the RCA Officers. The "Unduer of Knots" demanded that the Board take action to remove Kari under threat of revealing Kari's inappropriate relationship "to the world".

62. Upon information and belief, the author of the "Unduer of Knots" email, working with other disgruntled past employees, was Kathryn (Katie) Boos, a former employee of the RCA-Dallas center who was terminated in May 2021, and who, while employed, circulated a petition during school hours requesting the RCA Board of Directors to fire Kari. Nicole Juba and Katie Boos were close friends at the time, and as such, upon information and belief, Katie Boos was enlisted by the RCA Officers to encourage RCA families to support Kari's ouster. Suspiciously, Katie Boos recently was rehired and elevated to a more senior position in the 2022-2023 school year.

63. Furthermore, upon information and belief, Katie Boos leaked confidential information to blogger Simcha Fisher, who had previously published a disparaging post on the VS community project, sharing similar details of the inappropriate relationship, as was reported in the "Unduer of Knots" email.

64. Furthermore, following the release of Kari's "retirement notice" that Lisa Wheeler co-drafted, the RCA Board of Directors and RCA Officers undertook a coordinated effort to remove all evidence of the Beckmans' founding and subsequent contributions to RCA's success, including, but not limited to, (1) providing no acknowledgement of Kari's departure or expression of appreciation for her almost nineteen years of service, (2) removing any history and founding information from RCA's website, and (3) purging all social media and interviews Kari had done for RCA from RCA's website.

65. As a result of the Board of Directors and RCA Officers' egregious behavior and unwillingness to follow any aspect of Catholic teaching, organizational principles, precedent,

forgiveness, or common-sense business practices in ousting Kari in the midst of her mental health issues, Rich also resigned his positions with RCA.

E.     **Aftermath following the Beckmans' Ouster**

66.    RCA further took steps to retaliate against the Beckmans through their three children, who had just undergone an incredibly difficult move to Texas for the VS project and transferred to the RCA Dallas center.  Specifically, after the hostile takeover, RCA banned Kari from the Dallas center where her children were attending school.  As a result of this further punitive action against the Beckmans, they had to make a very disruptive and costly move back to Atlanta so Kari could remain an integral part of her children attending RCA and to allow their three children to remain in the RCA program, including their high school senior daughter who needed to complete here coursework and graduate.  Upon transferring back to the Atlanta center, RCA ignored the Beckmans' request for an education transition plan.  Additionally, Fr. Tran, the RCA Chaplain, denied certain prayer requests for the Beckman family and refused spiritual direction for Kari's children despite their continuing attendance at RCA.

67.    After returning to Atlanta, several local RCA families contacted the Beckmans offering support and sympathy, for which the Beckmans are extremely grateful.  However, upon learning of the Beckmans' communication with these RCA families and friends, RCA leadership falsely accused the Beckmans of contacting donors and again retaliated against the Beckmans.

68.    RCA leadership took steps to ban Kari from all RCA centers, including the Atlanta center.  Further, RCA threatened to ban Kari from her daughter's graduation ceremony and even threatened to contact the police and have Kari forcibly removed for trespassing if Kari continued to communicate with RCA families.  RCA also threatened to prohibit Kari's daughter from attending her own graduation with her classmates that she had grown up with in the Catholic faith for many years.

**F.      Request for Redress**

69.      After returning to Atlanta, the Beckmans sought redress for the inappropriate damage RCA inflicted.   Specifically, the Beckmans sought modest remuneration for the intellectual property (as set forth in Paragraph 17) that the Beckmans owned and that they notified RCA to cease using following their ouster, and requested that RCA publicly restore and appropriately acknowledge the Beckmans' role in founding and building RCA into the educational institute it is to date.

70.      In or around January 2022, the Beckmans and RCA reached a potential settlement with RCA accomplishing these modest and justifiable goals.   However, shortly before the RCA Board of Directors ratified the proposed settlement, new directors were appointed and the new Board of Directors rejected the proposed settlement and stated, "if the Beckmans wanted to recover anything from RCA, they would have to sue RCA."   The RCA Officers that had pressured Kari to resign under duress handpicked the new RCA Board of Directors, including the Chairman of the Board who, coincidentally, is Nathan Loyd, a Georgia intellectual property attorney.

71.      Following this setback, the Beckmans took stock of what they thought was really important in life.   After much prayer and soul-searching, Rich and Kari determined that their love of RCA, as their founders, and the vision, mission, and benefit that RCA provided to their beloved Catholic community was more important to them than pursuing redress further.   Accordingly, despite the perpetuation of threats, defamatory actions, and the enormous harm to their reputations and family stability, Rich and Kari chose to take a step back and continue their lives going forward, healing from the abuse and betrayal of RCA senior leadership, and working on improving their marriage, their faith, and their family.   And for the ensuing months the Beckmans found some semblance of peace and healing knowing that ultimately, through their answering God's call to

found RCA, they brought something unprecedented into the world to the benefit of thousands of children and families.

**G.     RCA Tax Allegations**

72.     In December 2022, the Beckmans' peace and spirit of forgiveness was again shattered when they received correspondence from RCA counsel arbitrarily and capriciously attacking the Beckmans with false tax allegations.

73.     RCA contacted Rich and Kari on December 6, 2022 erroneously alleging that they had both received an excess benefit from RCA under Section 4958 of the Internal Revenue Code of 1986, as amended (the "Code").

74.     Specifically, RCA alleged that Rich was now an independent contractor and in his capacity as the former President and member of the Board of Directors, he received an excess benefit of (i) $37,500 from the joint purchase of a lot from RCA for less than its fair market value, and (ii) $24,731.03 in unsubstantiated corporate credit card charges.

75.     Furthermore, RCA determined that Rich's reasonable compensation as an officer and director of RCA would have been $48,596—Rich never collected a salary in 19 years of service, not to mention that this amount is a paltry sum compared to other similarly situated executive officers and directors.

76.     Therefore, RCA alleged that Rich is required to reimburse $13,635.03 as an "excess benefit amount" for 2021.

77.     Similarly, RCA issued an amended 2021 Form W-2 to Kari alleging that she must report additional compensation income as a result of (i) $37,500 from the joint purchase of a lot from RCA for less than its fair market value, (ii) $13,000 for housing, (iii) $12,670.73 for vehicle, and (iv) $19,503.27 in unsubstantiated corporate credit card charges—or, in sum, $82,674 in additional compensation in 2021.

78.     RCA filed these alleged amended tax documents under penalty of perjury along with its 2021 Form 990, Return of Organization Exempt from Income Tax—a document that is by law a public record since RCA is a tax-exempt organization under Section 501(c)(3) of the Code.

79.     The Beckmans vehemently dispute these amended tax documents and the contents therein because (1) Rich was undeniably an employee and not an independent contractor and (2) the "excess benefit" allegations are inapplicable because the RCA Board of Directors ratified the housing and vehicle use as an employer convenience and the Beckmans work at the VS property more than recouped the benefit received, including the discounted purchase of the VS lot.  Again, the Beckmans moved their family to Texas at the behest of the RCA Board of Directors to further its mission to develop the VS community.  Furthermore, given the gravity of this latest action to besmirch and harm the Beckmans, the Beckmans have no option but to seek redress in total for RCA's continuing pattern of abuse and harassment.

80.     Additionally, without deciding whether the discounted purchase of the VS lot may constitute an "excess benefit", the Beckmans paid $37,500 for the lot and the amended tax forms RCA issued reflect a total benefit of $75,000, so any such "excess benefit" is double counted on its face.

81.     Furthermore, any proposed unsubstantiated corporate charges are erroneous, as Rich and Kari worked with RCA's accounting department to ensure that such charges were properly coded and substantiated in RCA's accounting system.

82.     To the extent that additional documentation is required, such documentation is in the possession and control of RCA, as all receipts and credit card statements were stored either at the RCA corporate office in Atlanta or the office in Winona, Texas from which RCA evicted the Beckmans following Kari's forced resignation.

83.     As result of RCA's latest transgression in issuing the erroneous tax forms to the Beckmans under penalty of perjury, which increases the Beckmans' overall tax amount due on their tax return and also increases the Beckmans' and RCA's risk of Internal Revenue Service scrutiny, and the foregoing pattern of RCA's abuse and harassment that began over a year ago in October 2021, the Beckmans plead the following claims.

CLAIMS AND CAUSES OF ACTION

84.     Under Rule 8(d)(2) of the Federal Rules of Civil Procedure, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."  Under Rule 8(d)(3) of the Federal Rules of Civil Procedure, "[a] party may state as many separate claims or defenses as it has, regardless of consistency."  Pursuant to the foregoing rules, the Beckmans plead the following, directly, in the alternative, or hypothetically, regardless of consistency.

**A.     Application for Declaratory Judgment**

85.     In accordance with the Texas Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code, the Beckmans request the Court issue a declaratory judgment as to the Form 1099-MISC issued to Rich and amended Form W-2 issued to Kari.

86.     Specifically, the Beckmans request the Court to declare that Rich received no "excess benefit" from the discounted property transaction and that no unsubstantiated expenses existed in 2021.  Accordingly, RCA shall withdraw the Form 1099-MISC RCA issued to Rich and/or issue corrected tax forms, and amend its 2021 Form 990 to remove such erroneous allegation from the public record.

87.     Further, the Beckmans request the Court to declare that Kari received no additional compensation as a result of (i) the discounted property transaction, (ii) the housing expense, (iii)

the vehicle expense, and (iv) no unsubstantiated expenses existed in 2021.  Accordingly, RCA shall withdraw the amended Form W-2 RCA issued to Kari and/or issue corrected tax forms, and amend its 2021 Form 990 to remove such erroneous allegation from the public record.

88.     Lastly, the Beckmans request the Court to declare that Rich was an employee of RCA rather than an independent contractor.

**B.     Fraud by RCA and Fr. Tran**

89.     In the spring or early summer of 2021, Fr. Tran implicitly or explicitly represented to Kari that he would not disclose anything he learned from Kari during the course of their spiritual guidance sessions related to the inappropriate relationship Kari engaged in with the former Director.  In doing so, Fr. Tran sought to oust the Beckmans from the school in which they founded and to elevate his position within RCA and amongst its Board of Directors—ends that he successfully achieved at the Beckmans' expense.

90.     Additionally, during the latter half of October 2021, Rich, at the direction of RCA religious liberty attorneys, informed RCA's Board of Directors of Kari's inappropriate relationship with the former Director and of her leave of absence to seek mental health treatment, which RCA, by and through its Board of Directors, ratified. During this same time, the RCA Board of Directors convened a meeting to discuss the length of Kari's leave of absence and whether her leave would be paid or unpaid. RCA, by and through its Board of Directors, falsely represented to the Beckmans at or following this meeting that it supported Kari's medical leave and was not contemplating terminating her employment; however, shortly thereafter on October 31, 2021, RCA's Board of Directors, in an effort to oust the Beckmans from the school they founded, called a second meeting without proper notice, forced Kari to attend while on medical leave for what had already been diagnosed as Complex Post-Traumatic Stress Disorder and Complex Grief, and coerced Kari into resigning from RCA.

91.     Further, RCA issued no tax documents to Rich in 2021 and issued Kari an original 2021 Form W-2.  In doing so, RCA represented that Rich had not received any excess benefits or compensation and that Kari had not received any excess benefits or additional compensation. However, in December 2022, RCA issued a tardy 2021 Form 1099-MISC and amended 2021 Form W-2 to Rich and Kari, respectively, alleging both had received excess benefits and/or untaxed compensation, all of which the Beckmans vehemently deny. RCA issued these false tax documents with the intent of minimizing its own tax liability and denigrating and harassing the Beckmans.

92.     Based on the foregoing, RCA and Fr. Tran made material, false representations to the Beckmans, and did so knowing the representations were false or did so recklessly, as a positive assertion, and with knowledge of the Beckmans' trust in RCA and Fr. Tran.  RCA and Fr. Tran made these representations with the intent that the Beckmans act on them.  The Beckmans relied on these representations, and these representations caused the Beckmans injury.  Specifically, the RCA Board of Directors supported Kari's medical leave of absence.  Fr. Tran represented that the confidential discussions regarding Kari's mental health would remain confidential.  RCA issued original tax documents for Kari and Rich, which they relied upon in filing their individual tax returns.

93.     Further, or in the alternative, RCA and Fr. Tran concealed from or failed to disclose certain material facts to the Beckmans, which RCA and Fr. Tran had a duty to disclose.  RCA and Fr. Tran knew the Beckmans were unaware that RCA did not support Kari's medical leave of absence, Fr. Tran was going to disclose Kari's confidential information, and RCA was going to issue falsely amended tax documents and the Beckmans did not have an equal opportunity to discover these facts.  RCA and Fr. Tran were deliberately silent when RCA and Fr. Tran had a duty to disclose these facts to the Beckmans, and by failing to do so, RCA and Fr. Tran intended

to induce the Beckmans to take some action or refrain from acting.  The Beckmans relied on these nondisclosures and were injured as a result of acting without the knowledge of undisclosed facts.

94.     The Beckmans sustained damages as the direct and proximate result of the fraud perpetrated by RCA and Fr. Tran.

95.     Further, the Beckmans will show that RCA and Fr. Tran conspired by concerted action to commit the foregoing cause of action, which proximately resulted in the Beckmans' injuries and damages.

**C.     Negligent Misrepresentation by RCA and Fr. Tran**

96.     In the spring or early summer of 2021, Fr. Tran implicitly or explicitly represented to Kari that he would not disclose anything he learned from Kari during the course of their spiritual guidance sessions related to the inappropriate relationship Kari engaged in with the former Director.  In doing so, Fr. Tran sought to oust the Beckmans from the school in which they founded and to elevate his position within RCA and amongst its Board of Directors—ends that he successfully achieved at the Beckmans' expense.

97.     Additionally, during the latter half of October 2021, Rich, at the direction of RCA religious liberty attorneys, informed RCA's Board of Directors of Kari's inappropriate relationship with the former Director and of her leave of absence to seek mental health treatment, which RCA, by and through its Board of Directors, ratified. During this same time, the RCA Board of Directors convened a meeting to discuss the length of Kari's leave absence and whether her leave would be paid or unpaid. RCA, by and through its Board of Directors, falsely represented to the Beckmans at or following this meeting that it supported Kari's medical leave and was not contemplating terminating her employment; however, shortly thereafter on October 31, 2021, RCA's Board of Directors, in an effort to oust the Beckmans from the school they founded, called a second meeting without proper notice, forced Kari to attend while on medical leave for what had already been

diagnosed as Complex Post-Traumatic Stress Disorder and Complex Grief, and coerced Kari into resigning from RCA.

98.     Further, RCA issued no tax documents to Rich in 2021 and issued Kari an original 2021 Form W-2.  In doing so, RCA represented that Rich had not received any excess benefits or compensation and that Kari had not received any excess benefits or additional compensation. However, in December 2022, RCA issued a tardy 2021 Form 1099-MISC and amended 2021 Form W-2 to Rich and Kari, respectively, alleging both had received excess benefits and/or untaxed compensation, all of which the Beckmans vehemently deny. RCA issued these false tax documents with the intent of minimizing its own tax liability and denigrating and harassing the Beckmans.

99.     RCA and Fr. Tran supplied false information for the Beckmans' guidance, including, but not limited to, RCA's assurances of support for Kari's medical leave of absence, Fr. Tran's assurances of confidentiality, and conflicting tax forms for the Beckmans' use in preparing their taxes.

100.    RCA and Fr. Tran failed to exercise reasonable care and competence in obtaining or communicating the information supplied to the Beckmans.

101.    The Beckmans justifiably relied on those representations.

102.    The Beckmans sustained damages as the direct and proximate result of the negligent misrepresentations committed by the RCA and Fr. Tran.

103.    Further, the Beckmans will show that RCA and Fr. Tran conspired by concerted action to commit the foregoing cause of action, which proximately resulted in the Beckmans' injuries and damages.

**D.    Defamation by RCA**

104.    RCA and Fr. Tran published statements of fact referring to the Beckmans that were defamatory *per se* and false, and in doing so, RCA and Fr. Tran acted with negligence or actual

malice with regard to the truth of the statements.  For example, RCA and Fr. Tran issued erroneous tax forms to the Beckmans, which are publicly filed because RCA is a tax-exempt organization under Section 501(c)(3) of the Code.  RCA also issued talking points around November 14, 2021 to RCA staff and student families asserting that RCA was prepared with a succession plan, knowing that Kari would retire at some point and that the RCA officers have been essentially running RCA for over a year as Kari focused on other projects.  In fact, none of these assertions is true.

105.    The foregoing statements that RCA and Fr. Tran published are defamatory as a matter of law; alternatively, said statements are defamatory by innuendo or implication.

106.    For the tortious conduct described in this cause of action, the Beckmans seek nominal damages, economic damages, noneconomic damages, and exemplary damages described more specifically below.

### E.    Copyright Infringement by RCA

107.    RCA operates a website to market its services.  As part of its marketing and advertising activities, RCA displays the Logo on the website and has otherwise reproduced the Mission Statement (or derivatives thereof).

108.    At least as of November 2, 2021, Kari has not licensed or otherwise authorized any of the RCA and Fr. Tran to use the Logo or Mission Statement for any purpose or activity including the activities described in Paragraph 99.

109.    On information and belief, RCA violated and continues to violate Kari's exclusive rights in the Logo and Mission Statement (including the right to reproduce and right to prepare derivative works) by copying, publishing, and distributing materials, that include copies of (and/or derivatives of) the Logo and/or Mission Statement.

110.    On information and belief, each Defendant knowingly aided, assisted, encouraged, facilitated, and/or induced the copyright infringement of the Logo and Mission Statement, and as such, each Defendant is jointly and severally liable as a contributory infringer for the infringement of each other Defendant that they knowingly aided, assisted, encouraged, facilitated, and/or induced.

111.    Pursuant to 17 U.S.C. § 504(b), Kari is entitled to recover her actual damages and all profits of RCA that are attributable to the infringement.

112.    Pursuant to 17 U.S.C. § 502, Kari is entitled to preliminary and permanent injunctive relief to restrain copyright infringement of the Logo and Mission Statement, including but not limited to the further use of infringing materials that include the Logo, the Mission Statement, or derivatives thereof.

113.    Pursuant to 17 U.S.C. § 503(b), Kari is entitled to an order requiring the destruction or other reasonable disposition of all copies of materials that include the Logo, Mission Statement or derivatives thereof, found to have been made in violation of her exclusive rights.

114.    Kari generally avers that all conditions precedent to its rights of recovery have occurred or have been performed.

115.    Upon notice and hearing, Plaintiffs would show a substantial likelihood of success on the merits of this cause of action, a substantial threat of irreparable harm absent the issuance of a preliminary injunction enjoining RCA's use of the foregoing Intellectual Property, a balance of hardships associated with the issuance of said injunction in Plaintiffs' favor, and no disservice to the public interest imposed by the issuance of said injunction.

**F.    Conversion of Intellectual Property by RCA**

116.    Prior to RCA's termination of the Beckmans, the Beckmans were the owners or had rightful possession of the Intellectual Property.

117.    Following RCA's termination of the Beckmans, the RCA and Fr. Tran unlawfully and without authority assumed dominion and control over the Intellectual Property to the exclusion of the Beckmans' rights to said property.

118.    On November 18, 2021, the Beckmans demanded that the RCA and Fr. Tran return said property to the Beckmans, to which the RCA and Fr. Tran have, to date, refused.

119.    As a result, the Beckmans seek nominal damages, economic damages, noneconomic damages, and exemplary damages described more specifically below.

120.    Further, the Beckmans will show that RCA and Fr. Tran conspired by concerted action to commit the foregoing cause of action, which proximately resulted in the Beckmans' injuries and damages.

121.    Upon notice and hearing, Plaintiffs would show a substantial likelihood of success on the merits of this cause of action, a substantial threat of irreparable harm absent the issuance of a preliminary injunction enjoining RCA's use of the foregoing Intellectual Property, a balance of hardships associated with the issuance of said injunction in Plaintiffs' favor, and no disservice to the public interest imposed by the issuance of said injunction.

**G.    Professional Negligence by Defendant Fr. Tran and Employer Liability of the Archdiocese of Atlanta**

122.    Fr. Tran had a duty to exercise ordinary care and act as a spiritual counselor of reasonable and ordinary prudence under the same or similar circumstances in his counseling services, advice, statements, and representations to and/or for the Beckmans.

123.    Fr. Tran breached that duty by committing one or more of the following acts or omissions of negligence, which was a proximate cause of the occurrence, injuries, and/or damages in question in that:

27

a. Fr. Tran negligently failed to provide proper, adequate, safe, and confidential counseling services, advice, statements, and representations to and for the Beckmans;

b. Fr. Tran negligently made misrepresentations and statements to and about the Beckmans including his defamatory declaration that Kari is a narcissist; and

c. Fr. Tran negligently engaged in other inappropriate conduct and comments with his counseling services, advice, statements, and representations to, for, and about the Beckmans.

124.    At all times relevant to this cause of action, Fr. Tran was an employee with the Archdiocese of Atlanta and was acting in the course and scope of his employment; alternatively, the Archdiocese of Atlanta owed Plaintiffs a legal duty to hire, supervise, train, or retain competent priests; however, the Archdiocese of Atlanta breached that duty, which proximately caused Plaintiffs' injuries.

125.    The Beckmans sustained damages as the direct and proximate result of the foregoing negligence committed by Fr. Tran and the Archdiocese of Atlanta.

## H.    RCA's Breach of Contract with the Beckmans

126.    The Beckmans had an Agreement with RCA to provide educational services for their children.

127.    The Agreement is a valid enforceable contract.

128.    The Beckmans are the proper parties to sue for breach of contract.

129.    The Beckmans performed, tendered performance of, or were excused from performing their respective contractual obligations under the Agreement.

130.    RCA breached the Agreement by prohibiting the Beckmans from entering the RCA centers where their children were attending school and/or attending commencement ceremonies.

131. The Beckmans sustained damages as the direct and proximate result of RCA's breach of contract.

## I. RCA's Violation of the FLSA, 29 U.S.C. § 201 et seq.

132. At all times relevant to this dispute, RCA is an enterprise within the meaning of the FLSA. 29 U.S.C. § 203(s)(1)(B).

133. RCA misclassified Rich as an independent contractor, failed to pay him wages for all hours worked, and subjected Plaintiff to improper income tax reporting.

134. RCA's failure to pay wages earned to Rich in accordance with the FLSA was willful as that term is defined by Section 255(a) and was not based on a good faith belief that its conduct complied with the FLSA. Therefore, the three (3) year statute of limitations period applies to Rich's damages in this case.

135. Rich is entitled to wages for all hours worked and an amount equal to all of their unpaid wages as liquidated damages, as well as his reasonable and necessary attorneys' fees and costs of this action. 29 U.S.C. § 216(b).

## J. RCA's Breach of Contract with Rich

136. Rich pleads this breach-of-contract claim against RCA in the alternative should the Court determine that Rich is an independent contractor rather than an employee during the relevant period.

137. Rich entered into one or more enforceable agreements with RCA during his 19-year tenure with RCA as, among other titles, an officer and director of RCA.

138. During the time in which Rich rendered professional services for RCA's benefit, RCA, in violation of their agreements, failed to pay Rich.

139. Rich performed, tendered performance of, or was excused from performing his respective contractual obligations under the agreements.

140.    RCA's failure to pay Rich in accordance with their agreements constitutes breach of contract, which causes Rich to sustain damages as a direct and proximate result of RCA's breach of contract.

### JURY DEMAND

141.    The Beckmans demand a trial by jury as to all material issues of fact in this case.

### PRAYER

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, as follows:

A.    Declare that the 2021 Form 1099-MISC issued to Rich and amended 2021 Form W-2, and the contents therein, are erroneous and invalid, order Defendants to withdraw the same and/or issue corrected forms, and amend the 2021 Form 990 to reflect such withdrawal and/or correction;

B.    Upon notice and a hearing, issue a preliminary injunction enjoining Defendants from continuing to use the Intellectual Property;

C.    Appoint a receiver to ensure the successful management and operation of RCA to achieve the purpose and goals for which the Beckmans founded RCA;

D.    Award the Beckmans monetary damages in excess of $75,000 based upon the following:

    i.    Economic damages sustained in the past;

    ii.    Economic damages that, in reasonable probability, will be sustained in the future;

    iii.    Mental-anguish damages sustained in the past;

    iv.    Mental-anguish damages that, in reasonable probability, will be sustained in the future;

    v.    Exemplary damages upon a finding by clear and convincing evidence of

Defendants' liability for any claim or cause of action asserted by the Beckmans resulted from malice, fraud, or gross negligence;

vi. All costs associated with prosecuting this action, other than reasonable and necessary attorneys' fees, including, but not limited to, the costs associated with the retention of any expert witness;

vii. Reasonable and necessary attorneys' fees in accordance with the Texas Civil Practice and Remedies Code §§ 37.004, 37.005, 38.001, and/or any other relevant state or federal provision;

viii.   Pre- and post-judgment interest; and

E.   Such other and further relief as deemed just and proper.

DATED this 12th day of May 2023.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.**
1200 Smith Street, 14th Floor
Houston, Texas 7002
Telephone: (713) 658-1818
Facsimile (713) 658-2553

*/s/ Juan F. Vasquez, Jr.*
JUAN F. VASQUEZ, JR.
juan.vasquez@chamberlainlaw.com
Texas Bar No. 24033294
Southern District No. 2982

DAVID M. MEDINA
david.medina@chamberlainlaw.com
Texas Bar No. 88
Southern District No. 2609723

STUART H. CLEMENTS
stuart.clements@chamberlainlaw.com
Texas Bar No. 24087315
Southern District No. 3005543

SCOTT MCCARTY
scott.mccarty@chamberlainlaw.com
Texas Bar No. 24094826


*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served on all counsel of record on May 12, 2023 as follows.

Bradley E. Chambers
Texas Bar No. 24001860
Federal ID No. 22008
Kimberly A. Chojnacki
Texas Bar No. 24068696
Federal ID No. 2078408
BAKER DONELSON
1301 McKinney Street, Suite 3700
Houston, Texas 77010
Telephone: (713) 650-9700
Facsimile: (713) 650-9701
bchambers@bakerdonelson.com
kchojnacki@bakerdonelson.com

Counsel for Defendant RCA

J. Daniel Harkins
Attorney-In-Charge
Texas State Bar No. 09008990
TXSD No. 13009
Katherine (Katina) A. Zampas
Texas State Bar No. 24104456
TXSD No. 3836072
DYKEMA GOSSETT PLLC
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395
dharkins@dykema.com
kzampas@dykema.com

Counsel for Defendant Fr. Tran

*/s/ Juan F. Vasquez, Jr.*
JUAN F. VASQUEZ, JR.

30833296.v6

33