UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD IRVING BECKMAN
AND KARI ANN BECKMAN,

Plaintiffs,

v.

REGINA CAELI, INC. A/K/A
REGINA CAELI ACADEMY,
FATHER AUGUSTINE TRAN, AND
ARCHDIOCESE OF ATLANTA,

Defendants.

CIVIL ACTION NO.
1:23-CV-06000-SEG

**O R D E R**

This case comes before the Court on Defendants' motions to dismiss. (Doc. 70, 79, 91.)  After careful consideration, the Court enters the following order.

## I.   Factual Background

Plaintiffs Richard and Kari Beckman are a married, Catholic couple who founded Regina Caeli Academy ("RCA") in April 2003.  (Second Amend. Compl., Doc. 37 ¶ 17.)  RCA provides a classical Catholic education option for families, with in-class instruction two days a week and homeschooling for the remainder of the week.  (*Id.* ¶ 18.)  First established as one center in Atlanta, RCA has since expanded to include twenty-three RCA educational centers across the

United States and two affiliated centers in the United Kingdom. (*Id.* ¶¶ 21, 23.)

From RCA's inception until November 2021, Kari Beckman served as Executive Director of RCA, while Rich Beckman served as RCA's President and Chairman of the Board of Directors. (*Id.* ¶¶ 21, 22, 60.) In early 2021, the Beckmans moved their family from Atlanta, Georgia to Winona, Texas to lead the development of an RCA project called Veritatis Splendor ("VS")—a planned Catholic community to be built on 575 acres of land which RCA had purchased. (*Id.* ¶¶ 28-29.) The couple remained in their executive positions with RCA after their move, but also spent many hours volunteering to prepare and develop the property. (*Id.* ¶¶ 33-36.)

While in Texas, and with the RCA Board's approval, the family stayed in an existing residential lodge on the VS property without paying rent, though the couple paid all utilities. (*Id.* ¶¶ 30, 32.) The Board also approved the purchase of a four-wheel drive vehicle for use traversing, developing, and marketing the VS property. (*Id.* ¶ 31.) The Beckmans ultimately purchased their own lot in the VS community. (*Id.* ¶ 38.) They allege that "[i]n a show of gratitude and recognition . . . RCA offered the Beckmans a fifty percent discount on [the] lot in the VS community, which reduced the purchase price from $75,000 to $37,500." (*Id.*)

In October 2021, Kari revealed to Rich that she had been having an affair with a former member of the RCA Board of Directors.[1]  (*Id.* ¶¶ 39, 42.)  The Beckmans decided to move forward in their marriage.  (*Id.* ¶¶ 42; 43.)  Kari sought mental health counseling and spiritual guidance, placing herself on a medical leave of absence with RCA.  (*Id.* ¶¶ 41, 42.)  In seeking spiritual guidance, Kari reached out to Father Augustine Tran ("Fr. Tran"), a priest of the Archdiocese of Atlanta who served as a Chaplain to RCA, as well as as its Chief Financial Officer.  (*Id.* ¶¶ 43, 53.)  Fr. Tran had a close personal relationship with the Beckman family; he is the godfather of one of their eight children and confirmation sponsor of another, has traveled extensively with the family, and provided spiritual direction to the family for more than twenty years.  (*Id.* ¶ 53.)  Kari sought spiritual guidance from Fr. Tran by telephone. (*Id.* ¶ 43.)  He then traveled to Texas to counsel the Beckmans and "administer the Sacrament of Reconciliation for Kari under the Seal of Confession."  (*Id.*)

Shortly after Kari began her medical leave, attorneys for RCA contacted Rich in his capacity as President and Chairman of RCA's Board and informed him that they knew about Kari's affair with the former director and that news of the affair would likely become public.  (*Id.* ¶ 44.)  At the direction of the attorneys, Rich disclosed the affair to the RCA Board of Directors: Fr. Tran,

---

[1] The Court follows the lead of the second amended complaint in referring to Mr. and Mrs. Beckman by first name.

James Faber, Dan Saegaert, and Frank Scharchilli. (*Id.* ¶ 45.) He then disclosed the affair to the other RCA officers, including Director of Education Katrina Hartsock, Director of Development Annalisa Agustin, and acting Executive Director Nicole Juba. (*Id.* ¶ 46.)

At first, the Board indicated that it would support Kari's medical leave. (*Id.* ¶¶ 45-47.) However, in late October 2021, the RCA officers emailed Fr. Tran insisting that Kari be terminated and threatening to quit if she was not fired. (*Id.* ¶ 48.) On October 31, 2021, the Board called a meeting where they alleged that Kari had violated the RCA Code of Conduct and "insisted that Kari either resign or be fired." (*Id.* ¶¶ 50-51.) This meeting ended without any official action taking place.

Rich then called another board meeting, where he presented the option of a more gradual transition of duties from Kari to another executive director. (*Id.* ¶ 57.) The Board refused to consider alternatives, instead giving Kari 48 hours to decide whether she would resign, retire, or be terminated. (*Id.* ¶ 59.) Kari then offered to retire at the end of the school year, in May 2022. (*Id.* ¶ 60.) The Board refused this offer, instead disseminating a letter to all RCA employees and families which stated that Kari would retire effective immediately. (*Id.* ¶ 61.)

According to the Beckmans, Kari's ouster from RCA was a "shocking and devastating betrayal," a "hostile takeover," and a "conspiracy." (*Id.* ¶¶ 48, 62.)

4

The Beckmans complain that Defendants mistreated them in the time leading up to and since Kari's forced retirement.  They allege that during the October 31, 2021, board meeting Fr. Tran "inappropriately revealed details of the confidential conversation Kari and Fr. Tran had following her nervous breakdown and during her mental health crisis."  (*Id.* ¶ 52.)  They also take issue with the fact that the RCA Board first indicated that it would support Kari's leave, and then forced her to resign soon after.  (*Id.* ¶¶ 47-48.)

After Kari's resignation, the Beckmans allege that RCA defamed Kari (*id.* ¶ 106), improperly banned her from RCA centers which her children attended (*id.* ¶ 69); refused to provide the Beckmans with renumeration for use of their intellectual property (*id.* ¶¶ 70-71); and maliciously filed false tax documents to denigrate and harass them (*id.* ¶¶ 73-84).  In particular, the Beckmans contend that RCA issued false tax forms charging them with excess benefits related to their purchase of the VS community lot, use of the VS community lodge and four-wheel drive vehicle, and unsubstantiated corporate credit card charges.  (*Id.*).

## II.    Procedural History

The Beckmans initiated this action on January 25, 2023, filing suit in the U.S. District Court for the Southern District of Texas.  (Compl., Doc. 1.) Plaintiffs amended their complaint on May 12, 2023, adding the Archdiocese of Atlanta as a Defendant.  (First Amend. Compl., Doc. 21.)

In response to the first amended complaint, all three Defendants—Fr, Tran, RCA, and Archdiocese of Atlanta—filed motions to dismiss. (Doc. 26, 27, 32). Fr. Tran's motion also moved, in the alternative, to transfer the case to the Northern District of Georgia. (Doc. 26.) Pursuant to Fr. Tran's motion, Judge David S. Morales ordered this case transferred to the Northern District of Georgia, finding that venue was improper in the Southern District of Texas. (Order, Doc. 55.) Judge Morales did not rule on any other pending motions, including the motions to dismiss. (*Id.*)

During the interim period between Defendants filing their motions to dismiss and Judge Morales issuing his Order, Plaintiffs filed, without requesting leave, a second amended complaint. (Doc. 37.) Defendants opposed the amendment and moved to strike the second amended complaint. (Doc. 43, 49.)

This Court held a telephone conference with the parties on February 2, 2024. (Doc. 86.) During the conference, the Court retrospectively granted leave for Plaintiffs to file their second amended complaint, denied Defendants' motions to strike, and denied Defendants' previous motions to dismiss as moot. (*Id.*) Defendants were given 21 days to respond to Plaintiffs' second amended complaint. (*Id.*) Fr. Tran and the Archdiocese of Atlanta had previously filed motions to dismiss responding to Plaintiffs' second amended complaint in this Court. (Doc. 70, 71.) RCA later timely filed its motion to dismiss. (Doc. 91.)

6

Fr. Tran also filed a notice of joinder in RCA's motion.  (Doc. 92.)  Defendants'

motions to dismiss have been fully briefed.  (Doc. 70, 79, 91.)

## III.   Legal Standard

### A. Rule 12(b)(1)

A Rule 12(b)(1) motion challenges a Court's subject matter jurisdiction.

Motions under Rule 12(b)(1) may present either a facial or a factual attack on

the complaint.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir.

1990).   Facial attacks are based on the allegations of jurisdiction in the

complaint, and the court takes the allegations in the complaint as true.  *Id.* at

1529.  A factual attack under Rule 12(b)(1) challenges "the existence of subject

matter jurisdiction in fact."  *Id.* at 1529 (citing *Menchaca v. Chrysler Credit

Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  In such an instance, "the trial court

is free to weigh the evidence and satisfy itself as to the existence of its power

to hear the case."  *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th

Cir. 1981)).

### B. Rule 12(b)(6)

Rule 12(b)(6) provides for dismissal of a case when the complaint "fail[s]

to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged

in the complaint as true and construe them in the light most favorable to the

plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).  To

survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (citing *Twombly*, 550 U.S. at 557).  The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action"—it must allege facts that "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

## IV.   Discussion

The Beckmans bring ten counts against Defendants.  (Doc. 37.)  Many of these counts contain multiple or alternative claims.  In the interest of clarity, the Court will describe each claim before turning to Defendants' motions to dismiss.

Count 1 is an application for declaratory judgment under the Texas Uniform Declaratory Judgments Act.  (*Id.* ¶¶ 86-89.)  The Beckmans request

that the Court: (1) declare that Rich received no excess benefit in 2021 and order RCA to withdraw the Form 1099-MISC, issue corrected tax forms and amend its 2021 Form 990 to remove the excess benefit from the public record (*id.* ¶ 87); (2) declare that Kari received no additional compensation in 2021 and order RCA to withdraw the amended Form W-2, issue corrected tax forms, and amend its 2021 Form 990 to remove the additional compensation from the public record (*id.* ¶ 88); and (3) declare that Rich was an employee of RCA rather than an independent contractor (*id.* ¶ 89).

Count 2 states three fraud claims against RCA and Fr. Tran.  (*Id.* ¶¶ 90-97.)  First, the Beckmans allege that RCA falsely represented that it supported Kari's medical leave, but soon after, coerced Kari into resigning.  (*Id.* ¶¶ 91, 93-94.)  Second, they allege that Fr. Tran falsely represented that information Kari revealed during their spiritual counselling sessions would remain confidential.  (*Id.* ¶¶ 90, 93.)  Third, they accuse RCA of making false representations in tax documents they issued to the Beckmans, in violation of 26 U.S.C. § 7434.  (*Id.* ¶¶ 92, 97.)

Count 3 states three negligent misrepresentation claims against RCA and Fr. Tran that mirror the fraud claims in Count 2.  (*Id.* ¶¶ 98-105.)  First, the Beckmans allege that RCA falsely represented that it supported Kari's medical leave, but soon after, coerced Kari into resigning.  (*Id.* ¶¶ 99, 101.)  Second, they allege that Fr. Tran falsely represented that information Kari

revealed during their spiritual counselling sessions would remain confidential. (*Id.* ¶¶ 98, 101.)  Third, they accuse RCA of making false representations in tax documents they issued to the Beckmans.  (*Id.* ¶ 100.)

Count 4 states two defamation claims against RCA.  (*Id.* ¶¶ 106-110.) First, the Beckmans allege that RCA committed defamation by publishing erroneous tax forms.  (*Id.* ¶ 106.)  Second, they allege that RCA issued false talking points to RCA staff and student families "asserting that RCA was prepared with a succession plan, knowing that Kari would retire at some point and that the RCA officers have been essentially running RCA for over a year as Kari focused on other projects."  (*Id.* ¶ 106.)

Count 5 states a copyright infringement claim against RCA.  (*Id.* ¶¶ 111-19.)  The Beckmans allege that RCA violated and continues to violate Kari's copyrights covering RCA's logo and mission statement, by reproducing the copyrighted material on its website and elsewhere.  (*Id.* ¶¶ 111-13.)  Count 6 asserts a conversion of intellectual property claim against RCA based on the same allegedly wrongful use of Kari's copyrighted logo and mission statement. (*Id.* ¶¶ 120-25.)

Count 7 states a professional negligence claim against Fr. Tran, and vicariously against the Archdiocese of Atlanta as his employer.  (*Id.* ¶¶ 126-29.)  The Beckmans allege Fr. Tran breached his duty to act as a spiritual counselor of reasonable and ordinary prudence by failing to provide safe and

confidential counseling services, making misrepresentations, and engaging in inappropriate conduct. (*Id.* ¶ 127.) They also allege that Fr. Tran was an employee of the Archdiocese of Atlanta, acting in the course and scope of his employment, and that the Archdiocese breached its duty to hire, supervise, and train competent priests. (*Id.* ¶ 128.)

Count 8 states a breach of contract claim against RCA related to educational services. (*Id.* ¶¶ 130-35.) The Beckmans allege that RCA breached a contractual agreement to provide educational services to their children "by prohibiting the Beckmans from entering the RCA enters where their children were attending school and/or attending commencement ceremonies." (*Id.* ¶¶ 130, 134.)

Count 9 states a Fair Labor Standards Act (FLSA) claim against RCA. (*Id.* ¶¶ 136-39.) The Beckmans allege that RCA violated the FLSA by misclassifying Rich as an independent contractor, failing to pay him wages for all hours worked, and subjecting him to improper income tax reporting. (*Id.* ¶ 137.)

Count 10 states a breach of contract claim against RCA related to nonpayment of wages. (*Id.* ¶¶ 140-44.) The Beckmans allege that Rich entered into one or more enforceable agreements with RCA, and that RCA violated these agreements by failing to pay Rich. (*Id.* ¶¶ 141-42.)

Defendants have moved to dismiss all counts, arguing that the Court lacks subject matter jurisdiction over the dispute pursuant to the doctrine of ecclesiastical abstention and that Plaintiffs have failed to state a claim upon which relief can be granted.  The Court will consider these arguments in turn.

## A. Subject Matter Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over the Beckmans' claims based on the ecclesiastical abstention doctrine. (Doc. 70 at 8; Doc. 79 at 8; Doc. 91 at 8.)  In the Eleventh Circuit, ecclesiastical abstention is evaluated under the Rule 12(b)(1) framework for lack of subject matter jurisdiction.  *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928 (11th Cir. 2018); *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 1:21-CV-3161-TWT, 2022 WL 1540206, at \*4 (N.D. Ga. May 13, 2022); *Kawimbe v. African Methodist Episcopal Church, Inc.*, No. 1:20-CV-4711-SDG, 2021 WL 3852066, at \*4 (N.D. Ga. Aug. 27, 2021).

The ecclesiastical abstention doctrine is rooted in the First Amendment's mandate that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I; *Crowder v. S. Baptist Convention*, 828 F.2d 718, 721 (11th Cir. 1987).  Because "civil actions involving ecclesiastical disputes implicate both the Establishment and Free Exercise Clauses," courts do not possess jurisdiction

to review matters of "church doctrine and polity." *Myhre*, 719 F. App'x at 928 (11th Cir. 2018); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) ("The First Amendment protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.").

As the Eleventh Circuit has warned, "[b]y adjudicating religious disputes, civil courts risk affecting associational conduct and thereby chilling the free exercise of religious beliefs." *Crowder*, 828 F.2d at 721. "[E]ntering into a religious controversy and putting the enforcement power of the state behind a particular religious faction," also presents serious Establishment Clause concerns. *Id.* As a result, religious disputes "are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976). Instead, "courts are bound to accept the decisions of the highest judicatories of a religious organization . . . on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.*

The ecclesiastical abstention doctrine does not, however, strip civil courts of jurisdiction over all church-related disputes. *See Crowder*, 828 F.2d at 721 ("[T]he Court has also rejected an absolute rule that civil courts are powerless to resolve any church property dispute."); *Kelley v. Decatur Baptist Church*, No. 5:17-CV-01239-HNJ, 2019 WL 8014314, at *9 (N.D. Ala. Mar. 27,

13

2019).  "Civil courts may apply neutral principles of law to decide church disputes that involve no consideration of doctrinal matters."  *Myhre*, 719 F. App'x at 928 (quoting *Jones v. Wolf*, 443 U.S. 595, 602, 603 (1979)) (cleaned up).  "Although the neutral-principles approach is particularly well suited to property cases," courts may decide other types of church-related disputes "by application of purely secular legal rules."  *Carrier*, 2022 WL 1540206, at *4 (quoting *Puri v. Khalsa*, 844 F.3d 1152, 1165 (9th Cir. 2017)).  But "courts may not use the guise of the neutral principles approach to determine matters of religious doctrine, polity, [or] governance."  *Kelley*, 2019 WL 8014314, at *9 (quoting *Crowder*, 828 F.2d at 725).

"[D]ispute[s] involving the application of church doctrine and procedure to discipline one of its members," in particular, cannot be adjudicated using neutral principles.  *Myhre*, 719 F. App'x at 928; *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, No. 19-CV-62591, 2020 WL 43221, at *10 (S.D. Fla. Jan. 3, 2020), *aff'd*, 824 F. App'x 680 (11th Cir. 2020) ("[W]here a religious body adjudicates relations among its members, courts will not interfere . . . .").  For instance, in *Myhre*, the Eleventh Circuit affirmed abstention where a priest disputed "his defrocking, his excommunication, and the termination of his retirement benefits due to a theological disagreement," because adjudicating his claims "would have required encroachment into matters of church dogma and governance."  719 F. App'x at 928.

14

The Defendants here contend that the Court lacks subject matter jurisdiction because "[a]ll of the Beckmans' claims arise from the fallout of Kari's admitted affair and her subsequent resignation from RCA consistent with the adopted church teachings." (Doc. 91 at 8.)  As such, they argue, the Court is "barred from adjudicating [Defendants'] response to Kari's failure to conform with catholic moral standards." (*Id.* at 9.)  They contend that the Court may not use neutral principles to adjudicate any of Plaintiffs' claims and urge the Court to dismiss the case in its entirety.  (Doc. 70 at 13; Doc. 79 at 10; Doc. 91 at 9.)

Defendants, however, overstate the extent to which ecclesiastical abstention applies.  While adjudication of *some* of the lawsuit's claims would require the Court to impermissibly weigh matters of religious governance and discipline, other claims do not invoke matters of faith and may be decided using neutral principles.

### 1.  Claims Against Fr. Tran

The Court first considers Plaintiffs' claims against Fr. Tran for his alleged betrayal of confidentiality to Kari—namely those for fraud (Count 2), negligent misrepresentation (Count 3), and professional negligence (Count 7). The Beckmans allege that Fr. Tran "represented to Kari that he would not disclose anything he learned from Kari during the course of their *spiritual* guidance session," but then proceeded to breach that promise.  (*Id.* ¶ 98)

15

(emphasis added). In particular, Fr. Tran "inappropriately revealed details of th[is] confidential conversation" at an RCA board meeting. (*Id.* ¶ 52.) Addressing Kari publicly, Fr. Tran said, "I know I told you during our phone call that you had not ruined everything, but now I think you have." (*Id.*) He also allegedly accused Kari of not being repentant after her confession and referred to her as a narcissist. (*Id.*) Plaintiffs contend that, among other things, Fr. Tran breached his "duty to exercise ordinary care and act as a *spiritual* counselor of reasonable and ordinary prudence." (*Id.* ¶ 126) (emphasis added).

Because Plaintiffs' fraud, negligent misrepresentation, and professional negligence claims concern Fr. Tran's allegedly deficient performance in his role as Kari's *priest*, they fall within the core of the ecclesiastical abstention doctrine. Plaintiffs' complaint admits that Kari "sought *spiritual* guidance" from Fr. Tran "in his capacity as *Chaplain* for RCA and *priest* of the Archdiocese of Atlanta." (*Id.* ¶ 43) (emphasis added). Answering Kari's request, Fr. Tran provided "*spiritual* counselling" and "*spiritual* direction," and administered "the Sacrament of Reconciliation for Kari under the Seal of Confession." (*Id.* ¶¶ 43, 45) (emphasis added). Fr. Tran's alleged revelations to the RCA board directly stem from the "*spiritual* guidance sessions" he conducted with Kari. (*Id.* ¶ 90) (emphasis added).

16

These are matters of religion that cannot be resolved through neutral legal principals. Evaluating whether Fr. Tran committed fraud or was negligent in his religious counsel or administration of Catholic rituals would require analyzing his conduct against church standards of "discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Milivojevich*, 426 U.S. 696, 713 (1976). In similar circumstances, courts have found that examining the "veracity of [a spiritual adviser's] counsel" impermissibly encroaches on matters of religious doctrine. *Rymer v. Lemaster*, No. 3:16-CV-02711, 2017 WL 4414163, at *13 (M.D. Tenn. Aug. 30, 2017), *report and recommendation adopted*, No. 16-02711, 2017 WL 4411790 (M.D. Tenn. Oct. 4, 2017), *aff'd*, No. 18-5655, 2019 WL 2583007 (6th Cir. Jan. 14, 2019); *see also Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir. 1998) ("[T]he Free Exercise Clause protects religious relationships, including the counseling relationship between a minister and his or her parishioner.").

That is not to say that the ecclesiastical abstention doctrine "categorically insulate[s] religious relationships from judicial scrutiny." *Sanders*, 134 F.3d at 335. Clergy members may be held liable for misconduct in the performance of "essentially secular" activities such as marital or psychological counselling, so long as matters of religious doctrine or practice do not predominate. *Id.* For example, where a minister "h[o]ld[s] himself out" to "be a duly qualified person engaged in providing psychological counseling,"

17

he can be held liable for professional negligence for violating the secular standard of care for psychological counselling.  *Id.* at 336 (quoting *Dausch v. Rykse*, 52 F.3d 1425, 1427-28 (7th Cir.1994)).  But that liability does not extend to "clergy malpractice" claims that involve performance of religious activities, which courts have uniformly rejected.  *Id.* at 337.  Such a claim would require a court to define a standard of care for clergy, thereby "embroil[ing] courts in establishing the training, skill, and standards applicable for members of the clergy in a diversity of religions with widely varying beliefs."  *Id.* (quoting *F.G. v. MacDonell*, 696 A.2d 697, 703 (N.J. 1997)).

The face of Plaintiffs' complaint demonstrates that Fr. Tran's counselling to Kari was predominantly religious in nature.  Not only did Kari specifically seek out "*spiritual* guidance," but Fr. Tran performed "the Sacrament of Reconciliation for Kari under the Seal of Confession" during their "*spiritual* guidance sessions."  (*Id.* ¶¶ 43, 90) (emphasis added).  Moreover, Plaintiffs have not alleged that Fr. Tran "held himself out" as a professional providing "essentially secular" services or identified any secular standard of care that applied to Fr. Tran's spiritual counselling sessions.[2]  *Sanders*, 134 F.3d at 335-

---

[2] Plaintiffs point to Georgia's evidentiary privilege for communications between priests and parishioners as a "*secular* law" that could be applied to evaluate Fr. Tran's conduct.  (Doc. 89 at 4-5.)  While that argument is novel, this Court is unaware of any case that refashions an evidentiary privilege into a professional standard of care or private right of action for negligence.  Nor do Plaintiffs cite any.  Moreover, the existence of the privilege could be equally

37.   To the contrary, Plaintiffs seek to hold Fr. Tran to a duty to "act as a *spiritual* counselor of reasonable and ordinary prudence."  (Doc. 37 ¶ 126) (emphasis added).  In other words, Plaintiffs attempt to bring claims for Fr. Tran's malpractice as Kari's *priest*.

This Court lacks subject matter jurisdiction to referee religious counselling between a priest and his parishioner.  As a result, Plaintiffs' claims against Fr. Tran for fraud (Count 2), negligent misrepresentation (Count 3), and professional negligence (Count 7) are dismissed.

### 2.  Claim Against the Archdiocese of Atlanta

For the same reasons, the Court lacks subject matter jurisdiction to consider Plaintiffs' professional negligence claim against the Archdiocese of Atlanta.  (Count 7.)  The Beckmans advance two different theories for holding the Archdiocese liable: (1) vicarious liability as Fr. Tran's employer; and (2) liability for violating a duty to hire, supervise, train, or retain competent priests.  (*Id.* ¶ 128.)  Given that the vicarious liability claim stems from Fr. Tran's allegedly negligent provision of "spiritual guidance," the Court lacks subject matter jurisdiction to review it.

---

viewed as supporting a rationale of judicial noninterference with the priest-parishioner relationship.  In any event, the evidentiary privilege does nothing to alleviate the Court's concerns about regulating religious counselling between a priest and parishioner under the ecclesiastical abstention doctrine.

Plaintiffs' second theory of liability, based on negligent hiring and supervision, strikes at "the core of ecclesiastical concern." *Milivojevich*, 426 U.S. at 717. Decisions about a church's "[i]nternal organization"—including the appointment and supervision of priests—are "ecclesiastical actions" inappropriate for judicial review. *Id.* at 713. The U.S. Supreme Court has held that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . [impermissibly] interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012); *see also Milivojevich*, 426 U.S. at 711 ("Because the appointment (to the chaplaincy) is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." (quoting *Gonzalez v. Archbishop*, 280 U.S. 1, 16 (1929))).

The flip side of the coin—imposing civil liability on a church for hiring or retaining a priest—can also improperly interfere with internal church governance. Assessing Plaintiffs' allegation that the Archdiocese negligently hired, supervised, or trained Fr. Tran, with respect to his provision of spiritual counselling, would require the Court to consult ecclesiastical criteria and analyze the Archdiocese's doctrinal preferences. Again, the Court lacks subject matter jurisdiction to consider these issues under the ecclesiastical abstention

doctrine and dismisses Plaintiffs' professional negligence claim against the Archdiocese of Atlanta. (Count 7.)

### 3. Claims Against RCA Related to Kari's Termination

The Court now turns to the two claims concerning Kari's termination from RCA. (Counts 2 & 3.) Plaintiffs bring claims for fraud and negligent misrepresentation against RCA, alleging that RCA "falsely represented" that it supported Kari's medical leave and was not contemplating terminating her employment." (Doc. 37 ¶¶ 91, 99). Soon after, the RCA Board "coerced Kari into resigning from RCA." (*Id.*). The ecclesiastical abstention doctrine also precludes review of these claims.

As explained *supra*, courts must be wary of interfering in internal church governance, including "control over the selection of those who will personify [the church's] beliefs." *Hosanna-Tabor*, 565 U.S. at 188. Plaintiffs argue that the ecclesiastical abstention doctrine cannot apply to their claims against RCA because RCA is not a church. (Doc. 93 at 5.) In addition, they contend "[n]o formal or informal affiliation exists between RCA and the Catholic Church." (Doc. 93 at 5.)

However, as Judge Thrash of this Court has recognized, "there are numerous cases in which non-church religious organizations were permitted to make ecclesiastical abstention arguments. *See, e.g., Puri*, 844 F.3d 1152 (religious non-profit corporation); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d

859 (N.D. Ill. 2019) (religious educational institution); *Rymer v. Lemaster*, 2017 WL 4414163 (M.D. Tenn. Aug. 30, 2017) (private spiritual adviser)." *Carrier*, 2022 WL 1540206, at *5.  The purpose of the ecclesiastical abstention doctrine is to prevent courts from "adjudicating religious disputes" and "entering into . . . religious controversy." *Myhre*, 719 F. App'x at 928.  That rationale may apply with equal force to disputes involving non-church religious organizations like RCA.

As a threshold matter, the Complaint establishes that RCA is a religious institution.  Its name, *Regina Caeli* Academy, refers to a Catholic prayer.[3]  The Beckmans "founded RCA to provide a classical Catholic education option for families." (Doc. 37 ¶ 18.)  RCA also incorporated the "tenets of the Catholic Church and teachings of Jesus Christ" into its curriculum.  (*Id.* ¶ 19.) Moreover, RCA has a "Code of Conduct" that, at least in part, enforces religious standards of behavior on employees.  (*Id.* ¶ 51.)

The key inquiry remains whether Kari's claims related to her termination could be resolved by applying "neutral principles of law." *Myhre*, 719 F. App'x at 928.  The Court finds that they cannot because adjudicating

---

[3] The Court takes judicial notice of this fact because it "is generally known within the trial court's territorial jurisdiction." Fed. R. Evid. 201(b)(1); *see also Angelus Regina Caeli*, The Holy See, https://www.vatican.va/content/francesco/en/angelus.html (last visited Sep. 21, 2024).

the propriety of the RCA Board's termination of Kari requires considering "the conformity of the members of [a religious institution] to the standard of morals required of them." *Crowder*, 828 F.2d at 722. Plaintiffs' complaint is replete with admissions that Kari's termination was prompted by her "inappropriate relationship" with a former RCA director. (*Id.* ¶¶ 39, 40, 42, 44, 45, 46, 48, 51). The Board of Directors identified this transgression of the RCA Code of Conduct as the reason for forcing her resignation. (*Id.* ¶ 51).

Indeed, Plaintiffs specifically take issue with Kari's termination on *religious* grounds, alleging that "RCA had never dismissed an employee for a past personal sin that had been confessed and reconciled." (*Id.*) Instead, "former employees had been invited back to employment after curing personal sins that were confessed and reconciled, placing them *in good standing with the Catholic Church*." (*Id.*) (emphasis added). They complain that "[b]ased on RCA's flawed reasoning, the Code of Conduct could be used against any employee's past forgiven and repented sins, *violating Catholic principles and teachings*." (*Id.*) (emphasis added). And they accuse the RCA Officers of unfairly judging Kari to be "a horrific sinner undeserving of mercy." (*Id.* ¶ 48.)

This case is not unlike *Myhre*, where a plaintiff brought fraud and breach of contract claims against his former church for terminating his retirement benefits. *Myhre*, 719 F. App'x at 927-29. The plaintiff there complained that the church cancelled his benefits for failing to "remain[] as a member in good

23

standing of the denomination" and to "punish him" for a "theological disagreement." *Id.* In affirming dismissal for ecclesiastical abstention, the Eleventh Circuit reasoned that "the application of church doctrine and procedure to discipline one of its members is not appropriate for secular adjudication." *Id.* at 928. Because the plaintiff's entitlement to retirement benefits was conditioned on his good standing in the church, the court would have had to measure the plaintiff's conduct against "church rules and discipline." *Id.* at 929.

So too here. Even though Plaintiffs have styled their claims as ones for fraud and negligent misrepresentation, they rest on the propriety of RCA's discipline and termination of Kari.[4]  Kari complains that the RCA board first told her it supported her medical leave, and didn't contemplate terminating her, but subsequently forced her to retire. (Doc. 37 ¶¶ 91, 99). RCA's decision to force Kari into retirement, as the Complaint makes clear, was motivated by religious beliefs about her affair. Evaluating the reasonableness of RCA's actions in light of its religious standards, and their application to Kari's marital infidelity, would "excessively entangl[e] the [Court] in questions of ecclesiastical doctrine or belief." *Crowder*, 828 F.2d at 722 (explaining that courts cannot adjudicate the "conformity of the members of the church to the

---

[4] The Second Amended Complaint does not contain any allegations that RCA's Board did not have the requisite authority to terminate Kari.  (Doc. 37.)

24

standard of morals required of them"); *Myhre*, 719 F. App'x at 928; *see also*

*Grunwald v. Bornfreund*, 696 F. Supp. 838, 840 (E.D.N.Y. 1988) ("[W]here a

religious body adjudicates relations among its members, courts will not

interfere with the decisions of those bodies made in accordance with those

bodies' rules.").

Accordingly, the Court lacks subject matter jurisdiction to consider these

claims under the ecclesiastical abstention doctrine.  Plaintiffs' fraud and

negligent misrepresentation claims against RCA related to Kari's termination

are dismissed.  (Counts 2 & 3.)

### 4. Remaining Claims

Plaintiffs' remaining claims do not involve matters of religious doctrine

and thus are not barred by the doctrine of ecclesiastical abstention.  The Court

may apply neutral principles of law to resolve the claims related to RCA issuing

allegedly false tax documents and breach of contract for nonpayment of wages.

These include Plaintiffs' application for declaratory judgment (Count 1); and

claims for fraud (Count 2); negligent misrepresentation (Count 3); defamation

(Count 4); violation of the FLSA (Count 9); and breach of contract for

nonpayment (Count 10).  Religious doctrine and practice have no bearing on

these issues as they are presented here.  While religious organizations often

qualify for tax-exempt status, they are required to follow state-imposed rules

for the preparation of tax documents and payment of wages.  And courts have

subject matter jurisdiction to determine whether religious organizations have complied with tax rules, or satisfied contracts to pay wages. *See generally Branch Ministries v. Rossotti*, 211 F.3d 137, 142-44 (D.C. Cir. 2000) (concluding that the IRS's revocation of a church's tax-exempt status, for contravening political campaigning rules, did not violate the First Amendment); *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 205 (S.D.N.Y. 2020) (explaining that courts can "resolve contract issues where the case is capable of being determined solely upon the application of neutral principles of contract law, without resolving any controversy over religious doctrine").

The Court may also rely on neutral principles to resolve the claims based on RCA's alleged misuse of Kari's intellectual property—namely, copyright infringement (Count 5), and conversion of intellectual property (Count 6). That dispute concerns property, rather than matters of religious doctrine or practice. *See Carrier*, 2022 WL 1540206, at *4 ("[T]he neutral-principles approach is particularly well suited to property cases."); *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir. 1999) (finding that a trademark infringement claim was "susceptible to decision by neutral principles"). Because the Court can apply secular legal rules to decide whether RCA has infringed Plaintiffs' intellectual property, it will not abstain from hearing these claims.

The Beckmans' breach of contract claim, based on an alleged agreement with RCA to provide educational services to their children, is also capable of judicial review under neutral legal principles.  (Count 8.)  The acts that Plaintiffs complain of—preventing entry to the RCA centers where their children were attending school and prohibiting them from attending commencement ceremonies—do not, as they are described in the pleadings, implicate matters of religion.  (Doc. 37 ¶ 134.)

The Court may also employ neutral principles to resolve the other (non-tax-related) portion of Beckmans' defamation claim, which alleges that RCA made defamatory statements about Kari's retirement and RCA's leadership transition plan.  (Count 4.)  Where the alleged defamation "consist[s] of false statements that [are] not religious in nature," courts may properly evaluate them.  *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 350 (5th Cir. 2020).  The content of the allegedly defamatory statements in this case is not overtly religious and the Court's defamation analysis will not risk entanglement in questions of religious doctrine.  (Doc. 37 ¶ 106.)  The Court thus will not abstain from considering the defamation claim.

### 5. Summary

In sum, the following claims are dismissed for lack of subject matter jurisdiction: fraud against RCA related to Kari's termination (Count 2);[5] fraud against Fr. Tran (Count 2); negligent misrepresentation against RCA related to Kari's termination (Count 3);[6] negligent misrepresentation against Fr. Tran (Count 3); professional negligence against both Fr. Tran and the Archdiocese of Atlanta (Count 7).  The Court has subject matter jurisdiction to consider the Beckmans' remaining claims.  After 12(b)(1) review, no claims remain against Fr. Tran or the Archdiocese of Atlanta.  These parties are dismissed from the case.

### B. Rule 12(b)(6) Analysis

Having ruled on subject matter jurisdiction, the Court now considers whether Plaintiffs have adequately stated their remaining claims.

### 1. Declaratory Judgment

Citing the Texas Uniform Declaratory Judgments Act, the Beckmans request the Court to issue a declaratory judgment which: (1) declares that Rich received no excess benefit in 2021 and orders RCA to withdraw the IRS Form

---

[5] For the reasons stated in the following section of this order, the tax-related portion of Plaintiffs' fraud claim against RCA remains.  (Count 2.)

[6] For the reasons stated in the following section of this order, the tax-related portion of Plaintiffs' negligent misrepresentation claim against RCA remains. (Count 3.)

1099-MISC it issued Rich, issue corrected tax forms, and amend its 2021 Form 990 to remove the excess benefit from the public record; (2) declares that Kari received no additional compensation in 2021 and orders RCA to withdraw the amended Form W-2, issue corrected tax forms, and amend its 2021 Form 990 to remove the additional compensation from the public record; and (3) declares that Rich was an employee of RCA rather than an independent contractor. (Count 1; Doc. 37 ¶¶ 87-89); *see* Tex. Civ. Prac. & Rem. Code Ann. § 37.001, *et seq.*

> The Act states that
>
> "[a] court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. . . . The declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree."

Tex. Civ. Prac. & Rem. Code Ann. § 37.003.  "The Texas Declaratory Judgment Act is a procedural mechanism that is inapplicable in federal court."  *Piazzo v. Allstate Indemnity Co.*, 601 F. Supp. 3d 189, 195 (S.D. Tex. 2022); *see Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998).  Any request for declaratory judgment should have been brought under the federal statute. Accordingly, Plaintiffs' request for declaratory judgment under the Texas Declaratory Judgment Act is denied.  (Count 1.)

**2. Fraudulent Filing of Tax Information Returns Under 26 U.S.C. § 7434**

Plaintiffs allege that RCA violated 26 U.S.C. § 7434 by issuing and subsequently filing false amended tax forms, which improperly stated that the Beckmans had received excess benefits or untaxed compensation. (Count 2; Doc. 37 ¶ 92.)    Section 7434 "provides a private cause of action for civil damages for fraudulent filing of tax information returns." *Chin Hui Hood v. JeJe Enterprises, Inc.*, 207 F. Supp. 3d 1363, 1378 (N.D. Ga. 2016). It states in relevant part: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434. To establish a claim under 26 U.S.C. § 7434, a plaintiff must prove that the defendant (1) issued an information return; (2) the information return was fraudulent; and the defendant (3) willfully issued a fraudulent information return. *Id.* (quoting *Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1297-98 (S.D. Fla. 2014)).

Plaintiffs have pled facts which allege all three elements. First, the Beckmans allege that RCA issued an inaccurate Form 1099 to Rich and an inaccurate Form W-2 to Kari. These tax forms are information returns.

Second, the Beckmans allege that these information returns were fraudulent in multiple ways. They allege that RCA misclassified Rich as an

30

independent contractor rather than an employee, and thus improperly issued him a Form 1099 instead of a Form W-2.[7]  (Doc. 37 ¶ 80.)  This was improper, they say, because "Rich was undeniably an employee and not an independent contractor."  (*Id.*)

Moreover, the Beckmans allege that the returns issued to both Kari and Rich falsely represented the amount of income and benefits they received.  As to Rich, Plaintiffs allege that the Form 1099 falsely stated that "he received an excess benefit of (i) $37,500 from the joint purchase of the lot from RCA for less than its fair market value, and (ii) $24,731.03 in unsubstantiated corporate credit card charges," and owed $13,635.03—the amount above what RCA determined would have been his reasonable compensation, $48,596.  (*Id.* ¶¶ 75-77.)  As to Kari, Plaintiffs allege that the W-2 falsely stated that "she must report additional compensation income as a result of (i) $37,500 from the joint purchase of a lot from RCA for less than its fair market value; (ii) $13,000 for housing, (iii) $12,670.73 for vehicle, and (iv) $19,503.27 in unsubstantiated

---

[7] A claim based on this allegation may ultimately fail, as some of Plaintiffs' allegations suggest that Rich served as RCA's President and Chairman of the Board on a volunteer basis.  (Doc. 37 ¶ 22 ("During Rich's service as an officer and director of RCA, he never received a salary or other renumeration for the time expended in these capacities.")).  But at this stage, where the Court must draw all inferences in favor of Plaintiffs, the allegation satisfies the necessary element.

corporate credit card charges—or, in sum, $82,674 in additional compensation in 2021." (*Id.* ¶ 78.)

The Beckmans maintain that this excess benefit information was false "because the RCA Board of Directors ratified the housing and vehicle use as an employer convenience and the Beckmans work at the VS property more than recouped the benefit received, including the discounted purchase of the VS lot." (*Id.* ¶ 80.)   In addition, they contend that "any proposed unsubstantiated corporate charges are erroneous" and that RCA had documentation in its possession and control that substantiated the charges. (*Id.* ¶¶ 82-83.)

Plaintiffs have plausibly alleged that the tax returns RCA filed were fraudulent.  RCA argues that the Beckmans "affirm the amounts shown" on the returns because their Complaint includes the allegation that the Beckmans' work for RCA "more than recouped the benefit received." (Doc. 91 at 14.)  The Court disagrees with that strained reading of the Complaint, especially as it must draw all inferences in favor of Plaintiffs.  As explained, the Beckmans plainly dispute the amount of compensation RCA reported on their returns.  (Doc. 37 ¶¶ 75-84.)  Their assertion that any benefits they received were outweighed by the work they provided to RCA does not undercut those central allegations.

RCA also contends that misclassifying a worker as an independent contractor, rather than an employee, cannot form the basis of a Section 7434

claim.  (Doc. 91 at 15) (citing *Liverett v. Torres Advanced Enterprise Solutions, LLC*, 192 F. Supp. 3d 648, 650-55 (E.D. Va. 2016)).  But courts disagree on this point.  *See, e.g.*, *Chin Hui Hood*, 207 F. Supp. 3d at 1379 (explaining that "[c]ourts disagree . . . as to whether an information return is 'fraudulent' under the second element when the type of form issued is the improper one, or, alternatively, if the return must misrepresent the amount of payments made in order to qualify as 'fraudulent'").  As in *Chin Hui Hood*, the resolution of this legal issue "matters not in this action," at least at this early stage, for Plaintiffs plausibly allege both that RCA filed the wrong *type of form* and that they misrepresented *the amount of compensation*.  *Id.*  As such, they have adequately stated the second element of a Section 7434 claim.

With respect to the third element, "the Eleventh Circuit has not addressed the meaning of 'willfulness' in this statute, but 'circuit courts around the country have found that 'willfulness' . . . connotes a voluntary, intentional violation of a legal duty, and that tax fraud typically requires intentional wrongdoing.'"  *Chin Hui Hood*, 207 F. Supp. 3d at 1379 (quoting *Leon*, 51 F. Supp. 3d at 1298).[8]  Plaintiffs have sufficiently alleged that RCA voluntarily and intentionally reported false tax information.  The Beckmans state that

---

[8] *Leon* cites *Vandenheede v. Vecchio*, 541 F. App'x. 577, 580 (6th Cir. 2013); *Maciel v. Comm'r*, 489 F.3d 1018, 1026 (9th Cir. 2007); and *Granado v. Comm'r*, 792 F.2d 91, 93 (7th Cir. 1986).

RCA "willfully filed fraudulent information returns . . . with the intent of minimizing its own tax liability and denigrating and harassing the Beckmans." (Doc. 37 ¶ 92.)  Together, the allegations that the amended tax returns were issued after a protracted period of discord between the parties, that RCA had allegedly offered the Beckmans the lot at a discounted price, and that Rich was not on the RCA payroll at all, support an inference that RCA may have willfully falsified tax documents to harm the Beckmans.  (*Id*. ¶¶ 38, 75-84, 92.)

As Plaintiffs have plausibly alleged each element of a Section 7434 claim, the Court denies RCA's motion to dismiss Plaintiff's fraud count as to the portion of that count that asserts a violation of Section 7434.  (Count 2.)

### 3. Negligent Misrepresentation

Pursuant to the ecclesiastical abstention doctrine, the Court has dismissed Plaintiffs' negligent misrepresentation claims against Fr. Tran for allegedly breaching his promise of confidentiality to Kari and against RCA for alleged false representations related to Kari's termination.  One aspect of the claim remains: Plaintiffs allege that RCA is liable for negligent misrepresentation because it supplied false tax information for the Beckman's guidance by issuing erroneous tax forms. (Count 3; Doc. 37 ¶ 100.)  RCA moves to dismiss Plaintiffs' tax-related negligent misrepresentation claim but has not provided any argument addressing it.  Rather, RCA's arguments focus only on the negligent misrepresentation claims related to Fr. Tran's allegedly false

34

assurances of confidentiality and RCA's allegedly false assurances of support for Kari's medical leave.  (Doc. 91 at 10-13.)

"Under Fed. R. Civ. P. 12(b)(6), the party moving for dismissal for failure to state a claim upon which relief can be granted has the burden of proving that a claim has not been stated." *DeKalb Cnty. Sch. Dist. v. J.W.M.*, 445 F. Supp. 2d 1371, 1374 (N.D. Ga. 2006).  "It is not the responsibility of the Court to parse through the complaint looking for a reason to grant a defendant's motion to dismiss."  *Mathews v. Clark Atlanta University, Inc.*, No. 1:17-CV-2963-MLB, 2021 WL 4896330, at *7 (N.D. Ga. Feb. 23, 2021).

Especially in the absence of argument to the contrary, the Court finds that the allegations underlying the Beckmans' Section 7434 tax fraud claim also state a plausible claim for negligent misrepresentation of tax information. Under Georgia law, "[t]he only real distinction between negligent misrepresentation and fraud is the absence of the element of knowledge of the falsity of the information disclosed."  *Shea v. Best Buy Homes, LLC*, 533 F. Supp. 3d 1321, 1339 (N.D. Ga. 2021) (quoting *Holmes v. Grubman*, 691 S.E.2d 196, 200 (Ga. 2010)); *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1365 (N.D. Ga. 2006) ("Negligent misrepresentation is similar to fraud and requires the same elements of proof, the only difference being whether the defendant knowingly or negligently made the misrepresentations.").

As the Court has already found that Plaintiffs sufficiently alleged tax fraud, under Section 7434, it also denies RCA's motion to dismiss Plaintiffs' negligent misrepresentation claim, only with respect to the allegedly false tax information.  (Count 3.)

## 4.  Defamation

Plaintiffs advance two claims for defamation against RCA.  First, they argue that RCA defamed them by issuing erroneous tax forms, which are publicly filed because RCA is a tax-exempt organization under Section 501(c)(3) of the federal tax code.  (Count 4; Doc. 37 ¶ 106.)  Second, they contend that RCA issued defamatory "talking points . . . to RCA staff and student families asserting that RCA was prepared with a succession plan, knowing that Kari would retire at some point and that the RCA officers have been essentially running RCA for over a year as Kari focused on other projects." (*Id.*)

Georgia law[9] defines libel as the "false and malicious defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or

---

[9] Because the parties have litigated Plaintiffs' defamation claims under Georgia law, the Court will assume Georgia law applies.  *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012) ("If the parties litigate the case under the assumption that a certain law applies, we will assume that that law applies."); *Anderson v. Wilco Life Ins. Co.*, 17 F.4th 1339, 1345 (11th Cir. 2021).

ridicule." O.C.G.A. § 51-5-1(a). To state a plausible libel claim, a plaintiff must plead four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Smith v. DiFrancesco*, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017).

With regards to Plaintiffs' first claim, based on allegedly defamatory tax filings, RCA only challenges the second of the four elements. RCA contends that statements made to the IRS in federal tax documents are privileged, citing only one case interpreting District of Columbia law, and another based on California law.[10] (Doc. 91 at 16.) In response, Plaintiffs argue that a privilege determination is "a fact-based, evidentiary inquiry under [Georgia law], which require[s] a finding as to whether such statements were made in good faith." (Doc. 93 at 9.) Such an inquiry, Plaintiffs contend, is inappropriate at the motion to dismiss stage.

---

[10] RCA cites *Klayman* and *Bakst* for the proposition that statements within federal tax documents cannot be defamatory. But both of those courts analyzed federal tax filings under the statutory schemes in *their respective jurisdictions*. *Klayman v. Jud. Watch, Inc.*, No. CIV.A.06-670 CKK, 2007 WL 140978, at *18 (D.D.C. Jan. 17, 2007); *Bakst v. Cmty. Mem'l Health Sys., Inc.*, 2011 WL 13214303, at *12 (C.D. Cal. Jan. 31, 2011). Neither case addresses the critical question here, whether *Georgia law* absolutely or conditionally privileges statements in federal tax filings. Indeed, RCA fails to address Georgia law regarding privilege at all. (Doc. 91 at 16; Doc. 94 at 13.)

"Georgia law recognizes two different kinds of privileged communications, absolute and conditional." *Wertz v. Allen*, 721 S.E.2d 122, 126 (Ga. Ct. App. 2011). Communications afforded absolute privilege cannot form the basis of a defamation action under any circumstances, "regardless of the falsity of the statements or the speaker's malicious intent." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1348 (N.D. Ga. 2018) (quoting *Wertz*, 721 S.E.2d at 126). "[C]onditionally privileged statements, on the other hand, are actionable upon a showing of malice." *Id.*

> Absolute privilege covers statements made in judicial pleadings:
>
> All charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought, whether legally sufficient to obtain it or not, are privileged. However false and malicious such charges, allegations, and averments may be, they shall not be deemed libelous.

O.C.G.A. § 51-5-8. The privilege "is not limited to pleadings as defined by OCGA § 9–11–7(a) of the Civil Practice Act but has been more broadly construed to include official court documents and acts of legal process." *Renton v. Watson*, 739 S.E.2d 19, 24 (Ga. Ct. App. 2013) (cleaned up); *see also Mack v. Delta Air Lines, Inc.*, 639 F. App'x 582, 586 (11th Cir. 2016) (listing the factors to be considered in construing absolute privilege as the "nature of the proceeding and the character of the rights which may be affected by it," including "the availability of discovery and of an evidentiary hearing, whether the merits of the complaint will be reached during the proceeding, and the

38

scope of judicial review"). Absolute privilege also extends to "statements made in court by a witness that are responsive to a question posed by the trial court or counsel." *Id.* at 25.

Here, the allegedly defamatory statements RCA made to the IRS cannot be characterized as being made in official court documents or within acts of legal process. There is no allegation that RCA filed the allegedly false tax documents in connection with a judicial or even a quasi-judicial proceeding. Thus, if a privilege were to apply, it would be conditional privilege.

O.C.G.A. § 51-5-7 delineates nine categories of statements which qualify for conditional privilege. These are:

(1) Statements made in good faith in the performance of a public duty;

(2) Statements made in good faith in the performance of a legal or moral private duty;

(3) Statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned;

(4) Statements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern, as defined in subsection (c) of Code Section 9-11-11.1;

(5) Fair and honest reports of the proceedings of legislative or judicial bodies;

(6) Fair and honest reports of court proceedings;

(7) Comments of counsel, fairly made, on the circumstances of a case in which he or she is involved and on the conduct of the parties in connection therewith;

(8) Truthful reports of information received from any arresting officer or police authorities; and

(9) Comments upon the acts of public men or public women in their public capacity and with reference thereto.

O.C.G.A. § 51-5-7. "In order to establish that a statement is conditionally privileged, the party charged with making the otherwise defamatory statement must show that '(a) she acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons.'" *StopLoss*, 340 F. Supp. 3d at 1348 (quoting *Smith*, 802 S.E. 2d at 73); *see Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (explaining that, for a statement to be conditionally privileged, "the defendant must show, among other things, good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons" (cleaned up)).

Conditional privilege may be forfeited "if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted." O.C.G.A. § 51-5-9. Whether the privilege is lost under this statutory provision generally turns upon "whether the allegedly defamatory matter was uttered with knowledge that it was false or reckless disregard for whether it was true or false." *StopLoss Specialists*, 340

40

F. Supp. 3d at 1348-49 (collecting cases). "The question of conditional privilege is typically for the jury." *Smith*, 802 S.E.2d at 73.

RCA's statements to the IRS might be conditionally privileged under categories (1), (2), and (3): statements made in good faith in the performance of a public duty, statements made in good faith in the performance of a legal or moral private duty, and statements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned. O.C.G.A. § 51-5-7. But "the determination of whether [RCA's] statements were privileged, and thus immune from liability, turns on the issue of malice." *Saye v. Deloitte & Touche, LLP*, 670 S.E.2d 818, 822 (Ga. Ct. App. 2008). The Beckmans have alleged that in filing false tax documents, RCA acted maliciously, without privilege, and with an intent to cause them injury. (Doc. 37 ¶¶ 73-84; 106-110.) Those allegations, viewed in the context of the pleading as a whole, are sufficient, at this stage in the litigation, to plausibly suggest that RCA has forfeited conditional privilege.

RCA does not present any argument challenging the adequacy of Plaintiffs' allegations regarding the other elements of defamation—namely, the falsity of the statements, publication, fault, and special damages (or libel per se). (Doc. 91 at 16; Doc. 94 at 13.) Thus, the Court denies RCA's motion to dismiss Plaintiffs' defamation claim as it relates to allegedly false statements made in the tax documents. (Count 4.)

41

Next, the Court considers the Beckmans' second defamation claim that RCA issued defamatory "talking points . . . to RCA staff and student families asserting that RCA was prepared with a succession plan, knowing that Kari would retire at some point and that the RCA officers have been essentially running RCA for over a year as Kari focused on other projects." (*Id.*) The statement that Plaintiffs complain of was appended to an email containing Kari's resignation letter. (Doc. 27-4.) It reads, in relevant part:

> This leadership team, which has been in place for the past year and has been effectively running the organization, is the result of our ongoing succession planning. As Regina Caeli has grown at all levels within the organization over the years, we have been able to successfully maintain leadership at all of our Centers as well as our Corporate Staff. The Board of Directors has the utmost confidence that this leadership team will continue to effectively and efficiently run the operations of Regina Caeli Academy and lead us in the next steps of our mission.[11]

(*Id.*)

The Court agrees with RCA that this statement is so benign, as a matter of law, that it cannot plausibly constitute libel per se. To determine whether

---

[11] RCA filed the above-quoted statement as an exhibit to its motion to dismiss the amended complaint. (Doc. 27-4.) On a motion to dismiss, courts may consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A document is "incorporated by reference" if the document is "(1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). Both requirements are met here, as (1) the statement provides the basis for Plaintiffs' defamation claim, and (2) the parties do not dispute the authenticity of the statement to which Plaintiffs' amended complaint refers. (Doc. 37 ¶¶ 60, 106.)

a statement is defamatory per se, courts look to "the plain import of the words spoken." *Bellemead, LLC v. Stoker*, 631 S.E.2d 693, 695 (Ga. 2006) (quoting *Palombi v. Frito–Lay*, 526 S.E.2d 375 (Ga. Ct. App. 1999)). For a statement to be recognized as defamatory per se, its words must be "injurious on their face— without the aid of extrinsic proof." *Id.* (quoting *Macon Tel. Pub. Co. v. Elliott*, 302 S.E.2d 692 (Ga. Ct. App. 1983)). "[T]he court 'may not hunt for a strained construction' in order to hold the words used as being defamatory as a matter of law." *Id.* (quoting *Webster v. Wilkins*, 456 S.E.2d 699 (Ga. Ct. App. 1995)).

The Beckmans do not identify, with any specificity, what language they contend is defamatory, or how such language injured them. (Doc. 37 ¶ 106.) And RCA's assertions that its leadership team was engaged in "ongoing succession planning" and was "effectively running the organization" for the past year are not plainly injurious to the Beckmans. Organizations routinely engage in succession planning. *See, e.g.*, *Bos. v. Blue Cross & Blue Shield of Kansas, Inc.*, 431 F. App'x 763, 767 (10th Cir. 2011) ("[S]uccession planning is obviously necessary for a corporation to have."). That RCA—like countless other organizations—engaged in succession planning does not appear to suggest anything about the Beckmans, let alone injure their reputation.

Moreover, an organization's leadership team proclaiming its own effectiveness does nothing to paint the Beckmans in a false light. RCA's vague assertion about effectiveness also likely constitutes "an opinion or subjective

43

assessment, as to which reasonable minds could differ, [that] cannot be proved false." *Cottrell v. Smith*, 788 S.E.2d 772, 781 (Ga. 2016); *see also Grace v. Lowery*, 860 S.E.2d 159, 162 (Ga. Ct. App. 2021) ("[M]ere statements of opinion" cannot be defamatory unless "the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false.").

The fact that RCA's email was sent in the context of Kari's resignation does not change its plain meaning or suggest defamation of the Beckmans. To the contrary, that context suggests the statement's goal was to reassure RCA parents and students during a difficult time for the organization, rather than to defame the Beckmans.

Plaintiffs appear to read RCA's language as an insult—suggesting that "the RCA officers have been essentially running RCA for over a year as Kari focused on other projects." (Doc. 37 ¶ 106.) RCA's email does not contain those words or imply that meaning. Indeed, RCA's assertion that the leadership team had been running the organization for a year is not mutually exclusive with Kari also leading the organization as Executive Director prior to her resignation. Given that Kari was the Executive Director of RCA, one would likely consider her part and parcel of the leadership team until the moment she resigned. In any event, even if RCA's email suggested exactly what the

44

Beckmans say it does, it would not be "injurious on [its] face." *Bellemead*, 631 S.E.2d at 695.  The Court cannot find any reasonable interpretation of RCA's statement that, standing alone, injures the Beckmans' reputation, and it will not "strain" itself to do so.

Because the Beckmans cannot plead libel per se, they must proceed under libel per quod. *Zarach v. Atlanta Claims Ass'n*, 500 S.E.2d 1, 5 (Ga. Ct. App. 1998).  "[I]f the defamatory character of the words [does] not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo." *Id.*  "Unlike libel per se, actions alleging libel per quod must set forth and prove 'special damages,' or the action must be dismissed." *Hoffman-Pugh v. Ramsey*, 193 F. Supp. 2d 1295, 1299 (N.D. Ga. 2002), *aff'd*, 312 F.3d 1222 (11th Cir. 2002) (citing *Sumner v. First Union Nat'l Bank*, 409 S.E.2d 212 (Ga. Ct. App. 1991)); *Zarach*, 500 S.E.2d at 5 ("An essential element of an action for libel per quod is that the plaintiff be able to show special damages.").  "These special damages must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value." *Zarach*, 500 S.E.2d at 5 (cleaned up).

Here, Plaintiffs have failed to sufficiently plead special damages resulting from RCA's allegedly defamatory email.  The only allegations provided regarding damages are conclusory: "the Beckmans seek nominal

damages, general damages, economic damages, noneconomic damages, and exemplary damages described more specifically below." (Doc. 37 ¶ 110.) While the Beckmans assert that their damages will be "described more specifically below," they never provide any additional detail. (*Id.*) The prayer for relief section of the second amended complaint, among other things, requests "Economic damages sustained in the past"; "Economic damages that, in reasonable probability, will be sustained in the future"; "Exemplary damages upon a finding by clear and convincing evidence of Defendants' liability for any claim or cause of action asserted by the Beckmans [that] resulted from malice, fraud, or gross negligence." (*Id.* at 31.) These conclusory descriptions do not provide sufficient specificity. Elsewhere, the Beckmans admit that they seek reputational damages stemming from defamation that are "incapable of specific monetary valuation." (*Id.* ¶ 109.) These allegations fall far short of those required to plead special damages resulting from libel per quod. *See, e.g.*, *Bell v. Johnson Publ'g Co., LLC*, No. 7:16-CV-16 (HL), 2018 WL 357888, at *6 (M.D. Ga. Jan. 10, 2018) (holding that the plaintiffs' "claim of libel per quod fails as a matter of law because they did not plead special damages *with specificity* in their Amended Complaint" (emphasis added)).

As a result, the Plaintiffs' defamation claim based on RCA's statement to students and parents following Kari's resignation is dismissed. (Count 4.)

46

## 5. Copyright Infringement

The Beckmans also claim that RCA infringed Kari's copyrights in a logo and mission statement she authored prior to forming RCA. (Count 5; Doc. 37 ¶¶ 20; 111-19.) "To establish a prima facie case of copyright infringement," a plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232-33 (11th Cir. 2010) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)).

A plaintiff may plead the first element—ownership of a copyright—by demonstrating that she has registered his copyright with the U.S. Copyright Office pursuant to 17 U.S.C. § 411. *Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir. 1986). A certificate of copyright registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate," including the requirement of originality. 17 U.S.C. § 410(c). "Once the plaintiff produces a certificate of registration, the burden shifts to the defendant to establish that [the] work in which the copyright is claimed is unprotectable (for lack of originality)." *Latimer*, 601 F.3d 1224, 1233 (11th Cir. 2010) (cleaned up).

The second element of copyright infringement—copying—can be asserted "either directly or indirectly, by establishing that the defendant had

47

access, and produced something 'substantially similar,' to the copyrighted work." *Leigh v. Warner Bros.*, 212 F.3d 1210, 1214 (11th Cir. 2000). "'Substantial similarity' exists where 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 829 (11th Cir. 1982) (quoting *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 912 (2d Cir. 1980)).

> To establish copyright ownership, the Beckmans state that
>
> Prior to RCA's formation, Kari authored the shield logo and emblem ("Logo") and RCA's Mission Statement ("Mission Statement") (collectively, the "Intellectual Property"). Kari has filed, and subsequently received, copyright registrations for the Logo and the Mission Statement. The copyright registration numbers for the Logo and Mission Statement are VA 2-301-284 and TX 9-054-637, respectively. All Intellectual Property was created prior to the formation of RCA on April 9, 2003. Kari is the sole owner of all right, title, and interest in and to the copyrights in the Intellectual Property.

(Doc. 37 ¶ 20.) While the Beckmans failed to attach the relevant certificates of registration to the operative pleading, RCA has submitted entries from the U.S. Copyright Office's Copyright Public Records System confirming Kari's copyright registrations. (Doc. 27-2; Doc. 27-3.) The Court takes judicial notice that Kari's copyright registrations, bearing the same registration numbers, appear in the Copyright Office's online public catalog. *See, e.g., Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("The district court was entitled to take judicial notice of Microsoft's

48

federal copyright registrations, as published in the Copyright Office's registry."). At this early stage, the Beckmans' allegations are sufficient to establish ownership of copyright registration.

RCA notes that Kari's copyrights were "registered almost twenty years after RCA's first use without attribution and *after* Kari left RCA, on December 10 and 22, 2021, respectively." (Doc. 91 at 3.) That point is well taken, and the Court shares RCA's concerns about the length of time that elapsed between first use and registration. 17 U.S.C. § 410(c) provides that a "certificate of a registration made *before or within five years* after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c) (emphasis added). But the provision also states that "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." *Id.*

Based on the record at this early stage of the proceedings, the Court cannot determine, as a matter of law, that Kari's copyright registrations are invalid. For now, it exercises its discretion to accept the post-five-year registrations as plausibly stating copyright ownership. *See, e.g., Southall v. Force Partners, LLC*, No. 1:20-CV-03223, 2021 WL 3883082, at *3 (N.D. Ill. Aug. 31, 2021) ("[T]he statute mandates a presumption of validity for pre-five-year certificates, but the statute does not *forbid* a presumption of validity for

49

post-five-year certificates."); *Lifetime Homes, Inc. v. Residential Dev. Corp.*, 510 F. Supp. 2d 794, 801 (M.D. Fla. 2007) (finding that late-filed certificate demonstrated valid copyright ownership in the absence of any challenge); *Yurman Design, Inc. v. Golden Treasure Imps., Inc.*, 275 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003) (holding that late registrations can be considered prima facie evidence of valid copyright).

To establish copying, the Beckmans allege that RCA continues to display the logo on the website and reproduce the mission statement as part of its marketing and advertising activities. (Doc. 37 ¶¶ 111, 113.) Moreover, the Beckmans claim that they have not licensed or otherwise authorized RCA to use the logo or mission statement. (*Id.* ¶ 112.) These allegations plausibly allege copying, which RCA does not appear to dispute.

Instead, RCA contends that the Beckmans' copyright infringement claim cannot succeed for two reasons. First, it argues that "Kari's prior conduct of allowing RCA to use the copyrights for over a decade in exchange for compensation from 2008-2021 created an irrevocable nonexclusive implied license." (Doc. 91 at 22.) Alternatively, it contends that "Kari abandoned the copyrights through the overt act of allowing RCA to use them without any license and without attribution for nearly twenty years." (*Id.*)

The Court first considers the implied license argument. "Although the Copyright Act requires all exclusive transfers of copyright to be in writing, 17

U.S.C. § 204(a), 'non-exclusive licenses are exempt from this writing requirement, 17 U.S.C. § 101, and may be granted orally, or may even be implied from conduct.'" *McElroy v. Courtney Ajinca Events LLC*, 512 F. Supp. 3d 1328, 1336 (N.D. Ga. 2021) (quoting *Latimer*, 601 F.3d at 1235). "An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Latimer,* 601 F.3d at 1235. If an implied license has been granted, the copyright owner "waives his right to sue for copyright infringement while the nonexclusive license is in effect." *Wilchombe v. TeeVee Toons*, 555 F.3d 949, 956 (11th Cir. 2009).

"The existence of an implied license is a question of law for the Court." *McElroy*, 512 F. Supp. 3d at 1336. "To determine whether an implied license exists, the Court must focus on objective evidence that reveals the intent of the parties, as well as the scope of the license." *Skeete v. Entertainment Studios Home Ent., Inc.*, No. 1:10-CV-2709-JEC, 2011 WL 4014459, at *5 (N.D. Ga. Sept. 8, 2011). An implied license is an affirmative defense to a claim of copyright infringement, and "the alleged infringers have the burden of establishing an implied license." *Latimer,* 601 F.3d at 1235 (citing *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003)).

Because establishing an implied license requires the review of evidence beyond the pleadings, the Court cannot find that Kari granted RCA an implied

51

nonexclusive license on RCA's motion to dismiss. *See Signal 23 Television v. Anthony*, No. 1:17-CV-1452-SCJ, 2017 WL 11446907, at \*3 (N.D. Ga. Dec. 22, 2017) (declining to dismiss a copyright infringement claim where the complaint alleged an implied license, because "resolv[ing] such an issue would require presentation of evidence (not currently before the Court) and a conversion of the motion to dismiss into a motion for summary judgment"). While the conduct asserted by RCA suggests an implied license, "at this point there is no basis in the record for finding an implied nonexclusive license as a matter of law." *Skeete*, 2011 WL 4014459, at \*6 (denying a motion to dismiss a copyright infringement claim where the defendant raised implied license as an affirmative defense).

RCA's abandonment affirmative defense fails for the same reason, at this stage. *See Oravec v. Sunny Isles Luxury Ventures L.C.*, 469 F. Supp. 2d 1148, 1177 (S.D. Fla. 2006) (referring to abandonment as an affirmative defense to copyright infringement claims). "[A]bandonment can only be shown by proving that the copyright owner intended to surrender his rights." *Metro-Goldwyn-Mayer, Inc. v. Showcase Atlanta Co-op. Productions, Inc.*, 479 F. Supp. 351, 362 (N.D. Ga. 1979). "That intent must be manifested by some overt act." *Oravec*, 469 F. Supp. 2d at 1177.

Although RCA argues that Kari abandoned the copyrights by committing the "overt act of allowing RCA to use them without license and without

attribution for nearly twenty years," it has not yet had the opportunity to support this argument with proof. Nor has it presented any authority which demonstrates that allowing RCA to use the copyrights for this time period constitutes an overt act evincing abandonment. Later in the proceedings, RCA may successfully defend itself against the Beckmans' infringement claim under a theory of abandonment. On this record, however, the Court cannot find that Kari abandoned her copyrights.

As RCA cannot establish an implied license or abandonment at this stage, its motion to dismiss Plaintiffs' copyright infringement claim is denied. (Count 5.)

## 6. Conversion of Intellectual Property

Plaintiffs also bring a state law claim for conversion of their intellectual property. (Count 6; Doc. 37 ¶¶ 120-25.) They allege that "[f]ollowing the[ir] termination . . . , [RCA] unlawfully and without authority assumed dominion and control over the Intellectual Property to the exclusion of the Beckmans' rights to said property." (*Id.* ¶ 121.) RCA's motion to dismiss this claim consists of a single sentence. It argues the "claim is preempted by federal law because the Beckmans do not allege RCA unlawfully retained . . . the tangible object embodying plaintiff's work, and such allegation is required." (Doc. 91 at 23) (quoting 6A Fed. Proc. Forms § 17:57 & n.16) (cleaned up).

Section 301(a) of the Copyright Act states that the following state-law claims are preempted by federal law:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103.

17 U.S.C. § 301(a). "[T]his language sets up a two-part test for determining when a state-law claim is preempted" by federal copyright law. *Dunlap v. G & L Holding Grp.*, 381 F.3d 1285, 1293 (11th Cir. 2004). First, courts "must decide whether the rights at issue fall within the 'subject matter of copyright' set forth in sections 102 and 103; and second, [courts] must determine whether the rights at issue are 'equivalent to' the exclusive rights of section 106." *Id.* at 1293-94 (quoting *Crow v. Wainwright*, 720 F.2d 1224, 1225-26 (11th Cir. 1983)) (cleaned up).

The intellectual property at issue here—the emblem and mission statement—is clearly the subject matter of copyright, and was, in fact, copyrighted. (Doc. 37 ¶ 20.) Section 102 of the Copyright Act covers "pictorial" and "graphic" works like the logo, as well as "literary" works like the mission statement. 17 U.S.C. § 102(a). Moreover, the rights involved are equivalent to those set forth in section 106, which gives the owner of a copyright the exclusive rights of reproduction, adaptation, publication, performance and display. 17 U.S.C. § 106. The Beckmans have not alleged that RCA has done

54

anything with the intellectual property other than copy, reproduce, and display their copyrighted material.  (Doc. 37 ¶ 113); *see Fuss v. Bensch*, 601 F. Supp. 3d 1329, 1334 (N.D. Ga. 2022) (explaining that for conversion claims, "[t]o the extent that there is no tangible embodiment, conversion of an intangible shades into a copyright-style cause of action" and is preempted by federal copyright law (quoting 1 Nimmer on Copyright § 1.15[I][2] (2022))).  Those are precisely the same rights that copyright protection affords.  As a result, the Beckmans' state-law conversion claim is equivalent to their copyright infringement claim and is preempted by federal copyright law.

The Court grants RCA's motion to dismiss Plaintiffs' claim for conversion of intellectual property.  (Count 6.)

### 7.  Breach of Contract

The Beckmans bring two separate breach of contract claims. First, they assert that they "had an Agreement with RCA to provide educational services for their children." (Count 8; Doc. 37 ¶¶ 130-35.)  RCA allegedly breached this agreement by "prohibiting the Beckmans from entering the RCA centers where their children were attending school and/or attending commencement ceremonies." (*Id.* ¶ 134.)  Second, the Beckmans claim that "Rich entered into one or more enforceable agreements with RCA during his 19-year tenure with RCA." (Count 10; *Id.* ¶¶ 140-44.)  "During the time in which Rich rendered professional services for RCA's benefit, RCA, in violation of their agreements,

failed to pay Rich." (*Id.* ¶ 142.)  Both breach of contract claims fail for the same reason: Plaintiffs have failed to describe the purported contracts with any specificity, let alone identify any particular terms that were breached.

To state a claim for breach of contract in Georgia, plaintiffs must allege: (1) the breach and (2) resulting damages (3) to the party who has the right to complain about the contract being broken.  *Norton v. Budget Rent a Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010).  Critically, plaintiffs "asserting a breach of contract claim must allege a particular contractual provision that the defendants violated to survive a motion to dismiss."  *Brooks v. Branch Banking and Trust Co.*, 107 F. Supp. 3d 1290, 1296 (N.D. Ga. 2015) (quoting *Anderson v. Deutsche Bank Nat'l Trust Co.*, 2012 WL 3756512, at *5 (N.D. Ga. Aug. 6, 2012)); *see American Casual Dining, L.P. v. Moe's Southwest Grill, LLC*, 426 F. Supp. 2d 1356, 1369 (N.D. Ga. 2006) ("Because [Plaintiff] cannot point to any contractual provision that [Defendant] breached . . . , [Plaintiff] cannot state a claim for breach of contract based on these allegations."); *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1327 (11th Cir. 2005) (same).

The Beckmans' complaint entirely neglects to identify a valid contract with any particularity, "or mention a specific contractual provision Defendant breached."  *Brooks*, 107 F. Supp. 3d at 1296.  As to the first breach of contract claim, the Beckmans allege, in conclusory fashion, that they had "a valid enforceable contract" with RCA "to provide educational services for their

56

children." (Doc. 37 ¶ 130-31.) They "point to no contractual provision" that was breached. *Adkins*, 411 F.3d at 1327. Instead, they allege that RCA breached their agreement by "prohibiting the Beckmans from entering the RCA centers . . . and/or attending commencement ceremonies." (*Id.* ¶ 134.) To conclude, they claim they "sustained damages as the direct and proximate result of RCA's breach." (*Id.* ¶ 135.) The Beckmans never identify any specific contract, or any particular terms of that contract. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a breach of contract claim under Georgia law. *Iqbal*, 556 U.S. at 678.

The breach of contract claim premised on Rich's nonpayment fares no better. While the Beckmans reference "one or more enforceable agreements" between Rich and RCA, they neither attach the agreements to the amended complaint, nor provide any information whatsoever about their terms. (Doc. 37 ¶¶ 140-44.) In conclusory fashion, they allege that "[d]uring the time in which Rich rendered professional services for RCA's benefit, RCA, in violation of their agreements, failed to pay Rich." (*Id.* ¶ 140.) They repeat the same formulaic language about damages suffered "as a direct and proximate result of RCA's breach." (*Id.* ¶ 144.) Again, those formulaic recitations, without more specific allegations, cannot plausibly sustain a breach of contract claim.

57

Therefore, the Court grants RCA's motion to dismiss with respect to both of Plaintiffs' breach of contract claims.  (Counts 8 & 10.)

## 8.  FLSA Violation

Finally, Plaintiffs allege that RCA violated the FLSA by misclassifying Rich as an independent contractor, failing to pay him wages for all hours worked, and subjecting him to improper income tax reporting.  (Count 9; Doc. 37 ¶¶ 136-39.)  They state that this failure was willful and therefore the three-year statute of limitations period applies to Rich's damages in this case.  (*Id.* ¶ 138.)  RCA has moved to dismiss this claim, arguing that Rich is exempt from the statute either as a volunteer or an executive.  (Doc. 91 at 24.)  RCA also contends that the two-year statute for non-willful violations applies.  (*Id.*)

"Congress enacted the FLSA in 1938 with the goal of protecting all covered workers from substandard wages and oppressive working hours." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quotation omitted).  "The purpose of the act is to 'protect those whose livelihood is dependent upon finding employment within the business of others.'" *Hurst v. Youngelson*, 354 F. Supp. 3d 1362, 1368 (N.D. Ga. 2019) (quoting *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 300 (5th Cir. 1975)).  The FLSA entitles employees—but not independent contractors or other excepted workers, like volunteers or interns—to a minimum wage and overtime wages.  *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).

"[W]hether a worker is an employee or an independent contractor is a question of law for the court." *Hurst*, 354 F. Supp. 3d at 1368 (citing *Patel v. Wargo*, 803 F.2d 632 n.1 (11th Cir. 1986)). "To determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." *Scantland*, 721 F.3d at 1311.

The FLSA also explicitly excludes "volunteers" from the definition of an "employee":

> (A) The term "employee" does not include any individual who volunteers to perform services for *a public agency which is a State, a political subdivision of a State, or an interstate governmental agency*, if—
>
> > (i) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and
> >
> > (ii) such services are not the same type of services which the individual is employed to perform for such public agency.

29 U.S.C. § 203(e)(4)(A) (emphasis added). An additional FLSA provision exempts "individuals who volunteer their services solely for humanitarian purposes to private non-profit food banks and who receive from the food banks groceries." *Id.* § 203(e)(5). While the FLSA does not fully define the contours of a "volunteer," the Eleventh Circuit has deferred to the definition stated by the U.S. Department of Labor, describing a volunteer as:

59

> An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours.

*McKay v. Miami-Dade Cnty.*, 36 F.4th 1128, 1137 (11th Cir. 2022) (quoting 29 C.F.R. § 553.101(a)).  "[A] 'volunteer' under § 553.101(a) need only be motivated *in part* by 'civic, charitable, or humanitarian purposes.'" *Id.* at 1138 (emphasis added).

RCA's arguments that Rich is exempt from the FLSA as a volunteer or an executive fail at this stage.  Because RCA is a private entity, and not a food bank, the volunteer exception does not apply.  The plain language of the volunteer exception only applies to "a public agency which is a State, a political subdivision of a State, or an interstate governmental agency."  29 U.S.C. § 203(e)(4)(A).

That, of course, does not mean that Rich automatically qualifies as an employee for FLSA purposes.  As other courts have recognized, "the FLSA's definitions as they relate to who qualifies as an employee are not precise," and it can be "tricky" to determine whether a person is an employee.  *Morrison v. Veale*, No. 3:14-CV-1020-TFM, 2017 WL 1100898, at *5 (M.D. Ala. Mar. 23, 2017) (quoting *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015)).  However, the inquiry relies "heavily on factual determinations that cannot be resolved at this stage of the proceeding."  *Id.* at *8 (finding that

60

the determination of whether a person was a volunteer or an employee for FLSA purposes was inappropriate for summary judgment).

Moreover, the exempt executive defense is not relevant here, as the Beckmans have not alleged an FLSA overtime violation.  "The FLSA exempts from *overtime* 'any employee employed in a bona fide executive, administrative, or professional capacity,'" *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1340 (11th Cir. 1994) (quoting 29 U.S.C.A. § 213(a)(1)) (emphasis added).  Although the FLSA statutory framework technically exempts executives from its minimum wage requirement as well, 29 U.S.C. § 213(a)(1), to qualify as an executive in the first place, one must be compensated on a "salary basis" exceeding a minimum monetary threshold.  *See Altman v. Sterling Caterers, Inc.*, 879 F. Supp. 2d 1375, 1381 (S.D. Fla. 2012) ("According to Department of Labor ("DOL") Regulations, the employer must satisfy both a 'salary basis' test and a 'primary duties' test to demonstrate that an employee qualifies for [the executive] exemption."); *Hogan v. Allstate Ins. Co.*, 361 F.3d 621, 625-26 (11th Cir. 2004) (adopting the salary/duties tests from the DOL regulations as the tests for whether the executive exemption applies).  Here, Rich has alleged that he wasn't paid *at all* for hours that he worked, so he would not qualify as an executive for want of a salary.[12]

---

[12] He does allege that RCA compensated him in other ways.  (Doc. 37 ¶¶ 30-31, 38.)

While the Beckmans' FLSA allegations lack some detail, "extensive, detailed pleading is not the norm in the context of an FLSA claim." *Obertein v. Assured & Assocs. Pers. Care of Georgia, Inc.*, No. 1:14-CV-0490-AT, 2015 WL 13546465, at *2 (N.D. Ga. Feb. 23, 2015). Rich has adequately pled that he performed work for RCA, and that RCA failed to pay him wages for the hours he worked. (Doc. 37 ¶¶ 22, 137-39.) At this early stage, those facts are sufficient to allege that Rich "performed work for which [he] was not adequately compensated." *Woolridge v. Gateway Transp. of Ga., Inc.,* No. 4:19-CV-53-HLM-WEJ, 2019 WL 2610904, at *4 (N.D. Ga. June 24, 2019); *see also Sec'y of Labor v. Labbe*, 319 F. App'x 761, 764 (11th Cir. 2008) (holding that plaintiff sufficiently pled FLSA claim by alleging that the defendant failed to pay employees minimum wage and overtime at the appropriate rates, and stating, "[w]hile these allegations are not overly detailed, we find that a claim for relief for failure to pay minimum wage, [or] to provide overtime compensation . . . does not require more"). As a result, the Court denies RCA's motion to dismiss Rich Beckman's FLSA claim.[13] (Count 9.)

---

[13] However, any portion of Plaintiffs' FLSA claim that rests on improper income tax reporting cannot proceed. Improper tax reporting does not constitute a cause of action under the FLSA. *See Cloer v. Green Mountain Specialties Corp.*, No. 6:18-CV-999-Orl-40LRH, 2019 WL 13063470, at *3 (M.D. Fla. July 3, 2019) ("[U]nder the FLSA, "the only damages recoverable are those for unpaid minimum wages or overtime.").

The parties also dispute the appropriate statute of limitations that applies to the Beckmans' FLSA claim—the two-year limitations period for non-willful violations, or the three-year period for willful violations. At this stage, construing the facts in favor of the Beckmans, the Court finds that Plaintiffs have adequately alleged willful violations. *See Labbe*, 319 F. App'x at 764 (11th Cir. 2008) ("presum[ing]" that an alleged FLSA violation was willful, for statute of limitations purposes, at the motion to dismiss stage). Because the original complaint in this case was filed on January 25, 2023 (Doc. 1), any violations preceding January 25, 2020, are likely time barred.

## V.    Conclusion

For the foregoing reasons, the Court will **GRANT** Fr. Tran's motion to dismiss (Doc. 70), and **GRANT** the Archdiocese of Atlanta's motion to dismiss (Doc. 79). Defendants Fr. Tran and Archdiocese of Atlanta are **DISMISSED FROM THE CASE**.

The Court will **GRANT IN PART** and **DENY IN PART** RCA's motion to dismiss (Doc. 91). Plaintiffs' request for declaratory judgment is **DENIED**. (Count 1.) The following claims are **DISMISSED**: fraud related to Kari Beckman's termination (Count 2); negligent misrepresentation related to Kari Beckman's termination (Count 3); defamation based on RCA's statement to students and parents following Kari Beckman's resignation (Count 4); conversion of intellectual property (Count 6); breach of contract related to

63

RCA's provision of educational services (Count 8); and breach of contract related to RCA's alleged nonpayment of wages (Count 10).[14]

The Court will allow the following claims against RCA to **PROCEED**: tax fraud under 26 U.S.C. § 7434 (Count 2); negligent misrepresentation related to tax documents (Count 3); defamation related to tax documents (Count 4); copyright infringement (Count 5); and violation of the FLSA (Count 9).

The discovery stay is lifted. The parties remaining in this case are **DIRECTED** to file an amended joint preliminary report and discovery plan within 14 days of the entry of this order.

The parties are reminded that the Court can order this case referred to mediation before a Magistrate Judge of this Court at no cost. If the parties agree that mediation would be productive, they may request a referral by joint motion.

**SO ORDERED** this 23rd day of September, 2024.

_____
SARAH E. GERAGHTY
United States District Judge

---

[14] Several of the claims asserted in this action were arguably frivolous. Plaintiffs are cautioned to heed their Rule 11 obligations as the case proceeds into the next phase of litigation. Fed. R. Civ. P. 11(b).