**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **RICHARD IRVING BECKMAN,** | ) | |
| **and KARI ANN BECKMAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | **1:23-cv-06000-SEG** |
| | ) | |
| **REGINA CAELI, INC., a/k/a** | ) | **JURY TRIAL DEMANDED** |
| **REGINA CAELI ACADEMY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## THIRD AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(2), **RICHARD IRVING BECKMAN** ("Rich") and **KARI ANN BECKMAN** ("Kari") (collectively, the "Beckmans" and "Plaintiffs") file this Third Amended Complaint against **REGINA CAELI, INC.,** a/k/a Regina Caeli Academy ("RCA"), and show the Court as follows:

## JURISDICTION AND VENUE

1.

Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction because the dispute arises under the Constitution, laws, or treaties of the United States.

2.

Pursuant to 28 U.S.C. § 1332(a), this Court has subject matter jurisdiction because the dispute is between citizens or entities of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

3.

This is, in part, an action at law and in equity for copyright infringement arising under the laws of the United States of America, codified at 17 U.S.C. § 101 *et seq*.

4.

This Court has exclusive federal jurisdiction over the subject matter of Plaintiffs' claims under 28 U.S.C. § 1338(a).

5.

Prior to the transfer of this action to the United States District Court for the Northern District of Georgia, the District Court for the Southern District of Texas

had general personal jurisdiction over RCA because RCA maintains substantial, continuous, and systematic contacts with the State of Texas. RCA maintains five (5) campuses in the State of Texas—more than any other state—and the majority of RCA's Board of Directors reside in Texas. Alternatively, the District Court for the Southern District of Texas had specific personal jurisdiction over RCA because RCA has minimum contacts with the State of Texas from which Plaintiffs' causes of action arise, RCA has purposefully directed its activities or availed itself of the benefits of the State of Texas, and the Court's exercise of personal jurisdiction over RCA is fair and reasonable.

6.

This Court has personal jurisdiction over RCA because RCA is a domestic non-profit corporation incorporated in the State of Georgia.

7.

Venue is proper in this District because RCA is a domestic corporation incorporated in the State of Georgia and its principal place of business in located in this District.

**PARTIES**

8.

At the time of filing of Plaintffs' initial Complaint, Rich was a domiciliary of Port O'Connor, Texas. He currently resides in Manassas, Virginia.

9.

At the time of filing the initial Complaint Kari was a domiciliary of Port O'Connor, Texas. She currently resides in Manassas, Virginia.

10.

Defendant RCA is a Georgia non-profit corporation with its principal place of business at 3295 River Exchange Drive, Suite 318, Norcross, Georgia  30092. RCA's registered agent for service of process is National Registered Agents, Inc., 289 South Culver Street, Lawrenceville, Georgia 33046.

**FACTUAL BACKGROUND**

11.

The Beckmans file this action in response to a pattern of abuse, harassment, and inappropriate actions RCA has lodged against the Beckmans, which commenced in October 2021 when RCA wrongfully terminated the Beckmans' employment after almost nineteen (19) years of service.

12.

RCA has engaged in unlawful and inappropriate actions against the Beckmans, including, but not limited to,  the issuance of an amended 2021 Form W-2 to Kari and a 2021 Form 1099-MISC to Rich in or around December 2022. In doing so, RCA again falsely and publicly harassed the Beckmans because RCA is a non-profit corporation, and its tax allegations are public record.

13.

The Beckmans founded RCA around April 29, 2003. Among other reasons, the Beckmans founded RCA because they were dissatisfied with the cost and curriculum offered by many of the Catholic schools available to their children in the Atlanta, Georgia area.

**A.     Founding Regina Caeli Academy**

14.

The Beckmans founded RCA to provide a classical Catholic education option for families and their children with in-class instruction two days a week and homeschooling, based on the curriculum, for the remainder of the school week.

15.

The curriculum focuses on academic excellence in addition to virtuous living principles based on the Catholic tradition. RCA enrolls students from Pre-Kindergarten through twelfth grade.

16.

Among the foundational principles that RCA incorporated into its curriculum are the virtues of repentance and forgiveness—the most basic tenets of the Catholic Church and the teachings of Jesus Christ.

17.

Prior to RCA's formation, Kari created the shield logo and emblem ("Logo") and RCA's Mission Statement ("Mission Statement") (collectively, the "Intellectual Property").

18.

In her capacity as the author and owner of the Logo and Mission Statement and derivatives thereof, Kari has filed, and subsequently received, copyright registrations for the Logo and the Mission Statement.

19.

The copyright registration numbers for the Logo and Mission Statement are VA 2-301- 284 and TX 9-054-637, respectively.

20.

All of the Intellectual Property was created prior to the formation of RCA on April 29, 2003.

21.

Kari is the sole owner of all right, title, and interest in and to the copyrights of the Intellectual Property.

22.

Initially, RCA established one facility in Atlanta, Georgia. The Beckmans used their own funds to start the program.

23.

After opening the first facility, Kari led RCA through its early days, met the requests of interested families, and began to implement the RCA program in other geographical regions.

24.

Kari served as Executive Director of RCA, but she was unpaid for the first five (5) years of RCA's existence.

25.

Since its inception, Rich served as RCA's President and Chairman of the Board until around November 2021.

26.

During Rich's service as an officer and director of RCA, he never received a salary or other remuneration for the time expended in these capacities.

27.

RCA grew into a thriving non-profit and educational institute with twenty-three centers in the United States and two affiliated centers in the United Kingdom, serving thousands of students and their families during the nineteen (19) years that the Beckmans led the organization, including Kari's work as Executive Director.

28.

The Beckmans' contributions to RCA were acknowledged many times.

29.

As the Executive Director, Kari received exemplary annual reviews and guided RCA through annual financial audits beginning in 2014 with no improprieties or irregularities ever reported.

30.

During Kari's tenure as Executive Director, RCA and its Board of Directors benefitted from the Beckmans' sacrifice, leadership, and financial prudence.

31.

As a result of the Beckmans' leadership and other contributions, RCA experienced enduring financial health and realized on opportunities for expansion over its first eighteen (18) years in existence.

32.

After the Beckmans were terminated, RCA failed, for the first time, to open new centers.

33.

By 2023, RCA had contracted to only nineteen (19) locations in the United States.

34.

As RCA's founding stakeholders and beneficiaries of services provided, the Beckmans have grave concerns about the current stability and viability of RCA.

35.

The Beckmans' concerns arise from the closing of locations by RCA, declining student enrollments, altering student formation practices, and excessive staff turnover.

36.

The Beckmans' concerns arise from mismanagement of RCA and violation of the fiduciary responsibilities of the officers and directors of RCA, which have departed from the founding principles of RCA.

37.

In addition to founding and managing RCA over the course of nearly (19) nineteen years, the Beckmans also enrolled their eight children in RCA from 2003 to 2022, with six of their eight children graduating from RCA.

**B.    Veritatis Splendor**

38.

In January 2021, the RCA Board of Directors approved the purchase of 575 acres of real property in Winona, Texas, for a new project called Veritatis Splendor ("VS"). RCA envisioned this project to be a uniquely integrated Catholic community in which people could more fully live out their faith. The VS community would provide members with a complete array of benefits, including daily, integrated Sacramental life; indoor and outdoor recreation activities; food cooperative services supported by a large greenhouse and organic farming; and education services spanning kindergarten through high school, university, and graduate school studies.

39.

The VS property purchase included an existing residential lodge but otherwise required extensive development and maintenance to convert the property into the RCA-envisioned community.

40.

The Beckmans agreed to move from the Atlanta, Georgia area after twenty-five years of residence and move to Winona, Texas, in order to fulfill the promise of this vision.

41.

In early 2021, following the purchase of the VS property, the RCA Board of Directors approved the Beckmans relocating their family to Winona, Texas, in order to lead the overall project development.

42.

The Board of Directors approved the Beckmans staying in the existing residential lodge on the VS property without paying rent, in lieu of hiring a caretaker, which the Board of Directors acknowledged would entail greater expense.

43.

The Board of Directors also approved the purchase and use of a four-wheel drive vehicle in order to allow the Beckmans to develop and market the VS property, which has terrain with varying elevations and conditions.

44.

This vehicle was the only vehicle that RCA provided to the Beckmans, and it was primarily used for business-related activities.

45.

While the Beckmans resided on the VS property, they personally paid for all utilities for the entire property.

46.

As caretakers of the VS property, the Beckmans expended extensive time and effort to prepare the VS property for sale.

47.

Kari engaged in marketing; worked with local realtors; planned sales events; showed the property, including on evenings and weekends; and made local and national media appearance concerning the projects.

48.

Rich volunteered his time to develop the property, including engaging with civil engineering professionals to plat residential lots; creating a master development plan with project phases; finding and engaging excavator companies to install roadways; engaging the electric and water suppliers to ensure plans for 75 home sites; securing the support of the county commissioner and Winona mayor; and supporting open house weekends for prospective buyers.

49.

The effort and hours that the Beckmans expended for the VS community more than offset the Board-approved rental and vehicle expense incurred.

50.

While residing at the lodge and assisting in the development of the VS community, the Beckmans also continued their duties with RCA. Therefore, the lodge served as Kari's primary RCA office in addition to the headquarters for the VS project.

51.

In addition to serving as the caretakers of the VS property, the Beckmans planned to purchase a lot in the VS community to build their home and then convert the existing lodge into a general use facility.

52.

In recognition of the many volunteer hours that the Beckmans worked on the VS project in 2021, and in order to allow the Beckmans to expand the efforts of VS in furtherance of RCA's mission, RCA offered the Beckmans a fifty (50%) percent discount on a lot in the VS community, which reduced the purchase price from $75,000 to $37,500.

## C.    Mental Health Crisis and Dismissal

53.

In the spring and early summer of 2021, Kari began experiencing significant mental health and spiritual issues resulting from a personal lapse in judgment. Specifically, several months prior, a then-RCA director ("former Director") and Kari engaged in an inappropriate relationship.

54.

The inappropriate relationship was terminated, but Kari's mental health continued to deteriorate.

55.

The stress of her RCA responsibilities, the many long hours of work, her standing in the Catholic community, the status of the person with whom she had the

inappropriate relationship, and the weight of her personal disappointment and guilt culminated in a nervous breakdown and suicidal state of mind on October 13, 2021.

56.

On October 13, 2021, Kari placed herself on a medical leave of absence and began to seek treatment for her mental health condition.

57.

Kari initially was treated at the University of Texas hospital behavioral health emergency center in Tyler, Texas, and began therapy with a licensed counseling professional, which she still sees.

58.

On October 14, 2021, Kari confessed her inappropriate relationship to Rich, who quickly forgave her and committed to a path of restoration and healing.

59.

Additionally, Kari sought spiritual guidance from Father Augustine Tran, in his capacity as Chaplain for RCA and as a priest of the Archdiocese of Atlanta.

60.

Kari contacted Fr. Tran by telephone for spiritual counseling, and he then travelled to Winona, Texas, to further counsel the Beckmans and administer the Sacrament of Reconciliation for Kari under the Seal of Confession.

61.

The Beckmans remain committed to each other and to their faith and recently celebrated thirty (30) years of marriage.

62.

After their reconciliation, the Beckmans planned to focus on restoring their marriage and on Kari's mental health during her leave of absence and then to resume their duties with RCA.

63.

Shortly after Kari began her leave of absence, certain attorneys for RCA contacted Rich in his capacity as President and Chairman of the Board of RCA and informed Rich that they were aware of the inappropriate relationship, which was likely to become public.

64.

Upon information and belief, RCA's attorneys had become aware of the then-director's initiation of the inappropriate relationship with Kari, through such attorneys' representation, in other matters, of the RCA director with whom Kari shared the inappropriate relationship.

65.

Rich then sought guidance from Fr. Tran, who was already aware of the inappropriate relationship, having provided spiritual direction to Kari on the issue.

66.

Fr. Tran was supportive and encouraged Rich, stating, "this is not the end of the world."

67.

At the direction of RCA's attorneys, Rich informed the RCA Board of Directors of the inappropriate relationship, after which they accepted Kari's request for a leave of absence.

68.

The Board of Directors was then comprised of Fr. Tran, James Faber, Dan Saegaert, and Frank Scarchilli.

69.

After informing the Board of Directors, Rich also informed the other RCA officers, including Katrina Hartsock, the Director of Education; Nicole Juba, the acting Executive Director; and Annalisa Agustin, the Director of Development (the "RCA Officers") of Kari's inappropriate relationship, mental health issues, and her approved medical leave of absence.

70.

At that time, the RCA Officers all reported directly to Kari, as Executive Director. Rich later had an in-person meeting with Nicole Juba to discuss Kari's situation and to discuss Kari's performance during the past year, which included the opening of seven (7) new RCA centers in the fall of 2021, which was a record number of openings.

71.

Rich and Nicole Juba also discussed whether Kari would be able to return as Executive Director.  Nicole then indicated that she was not yet ready to be Executive Director.

72.

During the last two weeks of October 2021, the RCA Board of Directors met to discuss the proposed length of Kari's leave of absence and whether such leave of absence would be paid or unpaid.

73.

 Rich recused himself during the portion of the meeting discussing whether Kari's leave of absence would be paid or unpaid.

74.

The Board of Directors, at that time, was supportive of Kari, and the Board did not discuss termination during the meeting.

75.

Shortly after this Board of Directors meeting, Rich received a text message from an RCA board member alerting Rich to a Board of Directors meeting that had been called without his notice in violation of RCA's Articles of Incorporation notice requirements.   Fr. Tran had called a Board of Directors meeting to address an email that Fr. Tran had received from the RCA Officers insisting that Kari be terminated.

76.

This text message was the first notice to the Beckmans that the RCA Officers were conspiring to oust Rich and Kari under threat that the RCA Officers would quit if Kari was not terminated. The RCA Officers now claimed that Kari was a horrific sinner undeserving of mercy.

77.

The RCA Officers then launched a coordinated campaign against Kari, using current and former employees and associates. The campaign began during the worst spiritual, mental, and physical condition of Kari's life.

78.

The RCA Officers seized this opportunity to control RCA for their own personal gain, while Kari was on medical leave of absence.

79.

While Kari was on medical leave of absence and suicide watch, the RCA Board of Directors demanded that Kari attend a meeting on October 31, 2021, where they insisted that Kari either resign or be fired.

80.

The Board of Directors alleged that Kari had violated the RCA Code of Conduct. The Beckmans responded that RCA had never dismissed an employee for a past personal sin that had been confessed and reconciled. On numerous occasions, former employees had been invited back to employment after curing personal sins that were confessed and reconciled, placing them in good standing with the Catholic Church.

81.

During this October 31, 2021, meeting Fr. Tran revealed details of his confidential conversation Kari following her nervous breakdown and mental health crisis.  He stated to the Board of Directors: "I know I told you during our phone call that you had not ruined everything, but now I think you have."

82.

In the meeting, Fr. Tran accused Kari of not being repentant after hearing her confession approximately one week prior. Fr. Tran reiterated his accusations in an email he sent to Kari on November 2, 2021.

83.

At or around this time, Fr. Tran publicly referred to Kari as a narcissist, despite having no training or experience as a mental health professional, and encouraged others to disassociate themselves from Kari, including two of Kari and Rich's own children.

84.

Fr. Tran is Godfather to one of the Beckmans' children, confirmation sponsor to another, provided spiritual direction to the Beckman family, and traveled extensively with the family for nearly twenty years.

85.

During 2021 and 2022, Fr. Tran, while still RCA Chaplain, also assumed the role of Chief Financial Officer of RCA. Fr. Tran should have recused himself from any decisions affecting Rich, Kari, or the Beckmans' children.

86.

Fr. Tran violated professional confidentiality as a counselor to the Beckmans by revealing information to the Board of Directors, which the Beckmans had shared with him in his capacity as a priest and Chaplain of RCA.

87.

The October 31, 2021, meeting ended abruptly with the RCA Board of Directors providing an ultimatum for Kari to resign or be fired.

88.

The Board of Directors had purposefully called a meeting, without noticing the President and Chairman of the Board (Rich), in order to conspire with the RCA Officers in order to terminate Kari.

89.

Kari's therapist has indicated that Kari should not have been working, making important decisions, and should not have been forced to attend a Board of Directors meeting, the subject of which was her dismissal, because Kari was on a medical leave of absence and had been diagnosed with Complex Post-Traumatic Stress Disorder and Complex Grief.

90.

Rich, in his capacity as President and Chairman of the Board, after consulting with RCA's corporate counsel, called a properly noticed Board of Directors meeting to discuss another option,

91.

Rich proposed a more gradual transition of duties rather than the Board of Directors' proposal of immediate dismissal. This proposal was based on Rich's professional experience with companies facing changes and the risk to operational stability when sudden and ill-planned leadership changes are made.

92.

The factual circumstances supporting Rich's proposal included:

(a)    the inappropriate relationship had ended and the former Director was no longer with RCA;

(b)    the relationship had caused extreme emotional duress by reason of the former Director's involvement and influence with RCA;

(c)    RCA was not compromised by the relationship nor was Kari's performance as Executive Director;

(d)    Kari had confessed her sin and sought absolution;

(e)     RCA had never dismissed an employee for a Code of Conduct violation in which subsequent correction and atonement did not result in an opportunity to return to RCA; and

(f)     Kari voluntarily disclosed the issue and requested a leave of absence to address the spiritual, mental, and physical ramifications.

93.

Notwithstanding Rich's arguments and Kari's health conditions, the Board of Directors, conspiring with the RCA Officers who had called for Kari's termination, refused to consider alternatives and instead decided that Kari must resign, retire, or be terminated, giving Kari 48 hours to decide, while Kari was on an approved medical leave of absence.

94.

Faced with this extreme pressure from the Board of Directors, Kari decided that rather than be "fired" from RCA, Kari offered to retire at the end of the upcoming school year (to allow for a smooth transition period and for succession planning to new leadership).

95.

Such succession planning had never been contemplated until the hostile takeover forced Kari out in November of 2021, although the Board of Directors and

the acting Executive Director, Nicole Juba, represented otherwise to the entire RCA organization and its enrolled families via email, which falsely implied that Kari had not been actively running RCA for the past year.

96.

Throughout this period, Kari lacked the mental clarity to make informed decisions, but nevertheless, RCA continued to make improper decisions directed toward her. Fr. Tran enlisted the assistance of Lisa Wheeler of Carmel Communications, with whom RCA had contracted as their communications liaison, to draft a letter that imposed two-hour time limit, and stating Kari's retirement would be immediate. Such letter was improperly disseminated to all RCA employees and families.

**D.    Additional Actions of Conspiracy**

97.

In the midst of the Board of Director's ousting of the Beckmans, led by Fr. Tran and the RCA Officers, the Board of Directors received an email from a source titled the "Unduer of Knots", which set forth in detail the events reported only to the Board of Directors and the RCA Officers. The "Unduer of Knots" demanded that the Board take action to remove Kari under threat of revealing Kari's inappropriate relationship "to the world".

98.

Upon information and belief, the author of the "Unduer of Knots" email, working with other disgruntled past employees, was Kathryn (Katie) Boos, a former employee of the RCA-Dallas center who was terminated in May 2021, and who, while employed, circulated a petition during school hours requesting the RCA Board of Directors to fire Kari.

99.

Nicole Juba and Katie Boos were close friends at the time, and, upon information and belief, Katie Boos was enlisted by the RCA Officers to encourage RCA families to support Kari's ouster. Katie Boos was recently rehired and elevated to a more senior position in the 2022-2023 school year.

100.

Upon information and belief, Katie Boos provided confidential information to "blogger" Simcha Fisher, who had previously published a disparaging post on the VS community project, and sharing similar details of the inappropriate relationship that were reported in the "Unduer of Knots" email.

101.

Following the release of Kari's so-called "retirement notice" that Lisa Wheeler co-drafted, the RCA Board of Directors and RCA Officers undertook a

coordinated effort to remove all evidence of the Beckmans' founding and subsequent contributions to RCA's success, including, but not limited to, (a) providing no acknowledgement of Kari's departure or expression of appreciation for her almost nineteen (19) years of service, (b) removing any history and founding information from RCA's website, and (c) purging all social media and interviews that Kari had done for RCA from RCA's website.

102.

As a result of the Board of Directors and RCA Officers' behavior and unwillingness to follow Catholic teachings, basic organizational principles, precedent, forgiveness, or common-sense business practices in ousting Kari in the midst of her mental health issues, Rich also resigned his positions with RCA.

**E.    Aftermath following the Beckmans' Ouster**

103.

RCA took further steps to retaliate against the Beckmans through their three children. RCA banned Kari from the Dallas center where her children were attending school. The Beckmans were required to make a disruptive and expensive move back to Atlanta so that Kari could remain an integral part of her children's attendance at RCA and to allow their three children to remain in the RCA program.   The

Beckmans' high school senior daughter also needed to complete her coursework and graduate.

104.

Upon transferring back to the Atlanta Center, RCA ignored the Beckmans' request for an education transition plan. Additionally, Fr. Tran, the RCA Chaplain, denied certain prayer requests for the Beckman family and refused spiritual direction for Kari's children despite their continuing attendance at RCA.

105.

After returning to Atlanta, several local RCA families contacted the Beckmans offering support and sympathy. However, upon learning of the Beckmans' communication with these RCA families and friends, RCA leadership falsely accused the Beckmans of contacting donors and again retaliated against the Beckmans.

106.

The RCA leadership took steps to ban Kari from all RCA Centers, including the Atlanta Center.

107.

RCA threatened to ban Kari from her daughter's graduation ceremony and even threatened to contact the police and have Kari forcibly removed for trespassing if Kari continued to communicate with RCA families.

108.

RCA threatened to prohibit Kari's daughter from attending her own graduation.

## F.    Request for Redress

109.

After returning to Atlanta, the Beckmans sought redress for the damage that RCA had inflicted.  The Beckmans sought remuneration for the intellectual property (as set forth in Paragraph 17) that the Beckmans owned and requested that RCA publicly restore and appropriately acknowledge the Beckmans' role in founding and building RCA into the educational institute that it is.

110.

In or around January 2022, the Beckmans and RCA reached a potential settlement. However, shortly before the RCA Board of Directors ratified the proposed settlement, new directors were appointed, and the new Board of Directors rejected the proposed settlement and stated, "if the Beckmans wanted to recover

anything from RCA, they would have to sue RCA." The RCA Officers that had pressured Kari to resign under duress chose the new RCA Board of Directors, including the Chairman of the Board.

111.

After much prayer and soul-searching, Rich and Kari determined that their love of RCA and the benefits that RCA provided to the Catholic community were more important to them than pursuing redress. Despite the harm to their reputations and family stability, Rich and Kari chose to continue their lives, healing from the abuse and betrayal of RCA senior leadership, and working on improving their marriage, their faith, and their family.

**G.    RCA Tax Allegations**

112.

In December 2022, the Beckmans received correspondence from RCA legal counsel setting forth false tax allegations.

113.

RCA contacted Rich and Kari on December 6, 2022, alleging that they had both received an "excess benefit" from RCA under Section 4958 of the Internal Revenue Code of 1986, as amended (the "Code").

114.

Specifically, RCA alleged that Rich was now an independent contractor and in his capacity as the former President and member of the Board of Directors, he received an "excess benefit" of (i) $37,500 from the joint purchase of a lot from RCA for less than its fair market value, and (ii) $24,731.03 in allegedly unsubstantiated corporate credit card charges.

115.

RCA further determined that Rich's reasonable compensation as an officer and director of RCA would have been $48,596.

116.

Rich had, in fact, never collected a salary during his years of service, not to mention that amount is a paltry sum compared to other similarly situated executive officers and directors.

117.

Therefore, RCA alleged that Rich is required to reimburse $13,635.03 as an "excess benefit amount" for 2021.

118.

Similarly, RCA issued an amended 2021 Form W-2 to Kari alleging that she should report additional compensation as a result of (i) $37,500 from the joint

purchase of a lot from RCA for less than its fair market value, (ii) $13,000 for housing, (iii) $12,670.73 for the four wheel drive vehicle, and (iv) $19,503.27 in unsubstantiated corporate credit card charges—or, in sum, $82,674 in additional compensation in 2021.

119.

RCA filed these amended tax documents under penalty of perjury along with its 2021 Form 990, Return of Organization Exempt from Income Tax, a document that is, by law, a public record since RCA is a tax-exempt organization under Section 501(c)(3) of the Code.

120.

Each of the income tax claims of RCA were false, because (a) Rich was undeniably an employee and not an independent contractor and (b) the "excess benefit" allegations are inapplicable because the RCA Board of Directors ratified the housing and vehicle use as an employer convenience and the Beckmans work at the VS property more than recouped the benefit received, including the discounted purchase of the VS lot.

121.

In fact, the Beckmans paid $37,500 for the Texas building lot and, thus, any purported "excess benefit" in the purported amount is facially inaccurate.

122.

All of the purported unsubstantiated corporate charges are erroneous, because Rich and Kari worked with RCA's accounting department to ensure that the charges were properly coded and substantiated in RCA's accounting system.

123.

All relevant receipts and credit card statements are stored either at the RCA corporate office in Atlanta or in the office in Winona, Texas.

124.

As result of RCA's issuance of erroneous income tax notices to the Beckmans, under penalty of perjury, the Beckmans' overall tax liabilities have been increased.

## COUNT ONE
## STATUTORY FRAUD (26 U.S.C. § 7434)

125.

Plaintiffs hereby incorporate by reference Paragraphs 1 through 124 as if fully restated herein.

126.

RCA issued no tax documents to Rich in 2021 and issued Kari an original 2021 Form W-2. In doing so, RCA represented that Rich had not received any "excess benefits" or compensation and that Kari had not received any excess benefits or additional compensation.

127.

In December 2022, RCA issued a tardy 2021 Form 1099-MISC and amended 2021 Form W-2 to Rich and Kari, respectively, alleging both had received excess benefits and/or untaxed compensation, all of which the Beckmans vehemently deny.

128.

The allegations of excess benefits and untaxed compensation in the 2021 Form 1099-MISC and the amended Form W-2 were false and fraudulent.

129.

Additionally, the 2021 Form 1099-MISC was not the proper form to be issued to Rich,  and therefore, RCA misclassified Rich as an independent contractor. The issuance of such form was fraudulent.

130.

RCA willfully issued and filed the fraudulent 2021 Form 1099-MISC and amended Form W-2 in violation of 26 U.S.C. § 7434. RCA did so with the intent of minimizing its own tax liability, and denigrating and harassing the Beckmans.

131.

Plaintiffs seek actual and statutory damages, the cost of court, and reasonable and necessary attorneys' fees pursuant to 26 U.S.C. § 7434.

## COUNT TWO
## DEFAMATION

### 132.

Plaintiffs hereby incorporate by reference Paragraphs 1 through 131 as if fully restated herein.

### 133.

RCA filed false tax filings, which are publicly filed because RCA is a tax-exempt organization under Section 501(c)(3) of the Code, with the intent to publicly impute a defect in the Beckmans' character and/or to show that the Beckmans' possessed a lack of knowledge, skill, or competence thereby rendering them unfit to engage in their chosen professions.

### 134.

These published statements of fact were defamatory per se and false.

### 135.

The foregoing statements that RCA published are defamatory as a matter of law; alternatively, said statements are defamatory by innuendo or implication.

### 136.

RCA published these defamatory statements with knowledge of their falsity or with reckless disregard of whether the statements were false or not.

138.

RCA's publishing the foregoing defamatory statements caused Plaintiffs to sustain general damages in the form of injuries to the Plaintiffs' character or reputation, mental suffering or anguish, and other similar wrongs or injuries incapable of specific monetary valuation.

139.

Furthermore, by publishing the defamatory statements, RCA has severely impaired the Plaintiffs' ability to secure similar positions as those they held at RCA, resulting in the loss of prospective income and professional advancement.

140.

For the tortious conduct described in this cause of action, the Beckmans seek nominal damages, general damages, economic damages, noneconomic damages, and exemplary damages described more specifically below.

**COUNT THREE**
**COPYRIGHT INFRINGEMENT**

141.

Plaintiffs hereby incorporate by reference Paragraphs 1 through 140 as if fully restated herein.

142.

RCA operates a website to market its services. As part of its marketing and advertising activities, RCA displays the Logo on the website and has otherwise reproduced the Mission Statement (or derivatives thereof).

143.

At least as of November 2, 2021, Kari has not licensed or otherwise authorized RCA to use the Logo or Mission Statement for any purpose or activity.

144.

On information and belief, RCA violated and continues to violate Kari's exclusive rights in the Logo and Mission Statement (including the right to reproduce and right to prepare derivative works) by copying, publishing, and distributing materials, that include copies of (and/or derivatives of) the Logo and/or Mission Statement.

145.

Pursuant to 17 U.S.C. § 504(b), Kari is entitled to recover her actual damages and all profits of RCA that are attributable to the infringement.

146.

Pursuant to 17 U.S.C. § 502, Kari is entitled to preliminary and permanent injunctive relief to restrain copyright infringement of the Logo and Mission

Statement, including but not limited to the further use of infringing materials that include the Logo, the Mission Statement, or derivatives thereof.

147.

Pursuant to 17 U.S.C. § 503(b), Kari is entitled to an order requiring the destruction or other reasonable disposition of all copies of materials that include the Logo, Mission Statement or derivatives thereof, found to have been made in violation of her exclusive rights.

148.

Kari generally avers that all conditions precedent to her rights of recovery have occurred or have been performed.

149.

In the alternative, if an implied license to use is found, such implied license was revoked at the time that RCA forced Kari to resign. Nonetheless, RCA continued to use the Intellectual Property without Kari's authorization.

**JURY DEMAND**

150.

The Beckmans demand a trial by jury as to all material issues of fact in this case.

## PRAYER

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, as follows:

A.     Award the Beckmans monetary damages in excess of $75,000 based upon the following:

i.     Economic damages sustained in the past;

ii.     Economic damages that, in reasonable probability, will be sustained in the future;

iii.     Mental-anguish damages sustained in the past;

iv.     Mental-anguish damages that, in reasonable probability, will be sustained in the future;

v.     Exemplary damages upon a finding by clear and convincing evidence of Defendants' liability for any claim or cause of action asserted by the Beckmans resulted from malice, fraud, or gross negligence;

vi.     All costs associated with prosecuting this action, other than reasonable and necessary attorneys' fees, including, but not limited to, the costs associated with the retention of any expert witness;

vii.     Reasonable and necessary attorneys' fees in accordance with O.C.G.A. § 13-6-11, 17 U.S.C. § 505, 26 U.S.C. § 7434, and/or any other relevant state or federal provisions;

      viii.   Pre- and post-judgment interest;

B.    Upon notice and a hearing, issue a preliminary injunction enjoining Defendants from continuing to use the Intellectual Property; and

C.    Such other and further relief as deemed just and proper.

DATED this 18th day of June, 2025.

                             **HASSON LAW GROUP, LLP**

                             **/s/Keith S. Hasson**
                             Keith S. Hasson
                             Georgia Bar No. 336383
                             Max S. Franco
                             Georgia Bar No. 355592
                             J. Tanner Lusk
                             Georgia Bar No. 496782

3379 Peachtree Road, NE
Suite 625
Atlanta, Georgia 30326
Telephone: (678) 701-2869
keith@hassonlawgroup.com
max@hassonlawgroup.com
tanner@hassonlawgroup.com